**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| VANDA PHARMACEUTICALS INC.,<br><br>                                   Plaintiff,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION et al.,<br><br>                                   Defendants. | No. 1:23-cv-02812-CRC |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff
Vanda Pharmaceuticals Inc.*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Glossary of Abbreviations ............................................................................................ x

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 3

    A.   FDA's approval of Vanda's NDA ................................................................. 3

    B.   FDA's unlawful approval of MSN's ANDA ............................................... 5

        1.   Legal and regulatory background .................................................... 5

            a.   General principles of bioequivalence ................................. 5

            b.   Effect of sex on bioequivalence ......................................... 7

            c.   Effect of race on bioequivalence ....................................... 7

            d.   FDA guidance on bioequivalence studies .......................... 8

        2.   MSN's ANDA No. 211654 ............................................................ 10

    C.   Relevant procedural history ...................................................................... 14

Argument ...................................................................................................................... 15

I.   FDA's approval of MSN's ANDA was unlawful because it failed to show bioequivalence. ..................................................................................................... 16

    A.   FDA's conclusion that MSN's bioequivalence study was "appropriately designed" was arbitrary and capricious. .......................................................... 16

        1.   FDA disregarded settled and tasimelteon-specific guidance requiring representation of the sexes and racial and ethnic diversity ................. 16

        2.   FDA failed to explain lack of blinding in MSN's bioequivalence study. ........... 19

    B.   FDA failed to consider critical pharmacokinetic and dissolution testing discrepancies that undermine MSN's bioequivalence study results. ....................... 20

    C.   FDA failed to explain how MSN's study was "adequate" despite the objectionable conditions at its study site ........................................................ 24

II.   FDA's approval of MSN's ANDA was contrary to law and in excess of statutory authorization. ....................................................................................................... 26

    A.   FDA's approval of MSN's ANDA violated the Appointments Clause. ....................... 26

    B.   FDA's attempted ratification plainly fails. ................................................. 28

        1.   Dr. Murphy is not a properly appointed inferior officer. ...................... 28

        2.   Dr. Murphy's exercise of power exceeds that of an inferior officer's ................ 33

        3.   The ratification was a prejudicial sham. ......................................... 35

    C.   FDA's approval of MSN's ANDA violated its own delegation of authority. ............. 39

i

        1.    The individuals who approved MSN's ANDA lacked authorization. ..................39

        2.    FDA's attempted ratification does nothing to cure the violation of the agency's own policy. ........................................................................................................39

III.   The Court should vacate FDA's approval of MSN's ANDA and direct a recall. .................40

    A.   Vacatur of FDA's approval of MSN's ANDA is warranted........................................40

    B.   The Court should compel FDA to initiate a recall of MSN's ANDA product. ...........42

Conclusion .............................................................................................................................. 43

# TABLE OF AUTHORITIES[*]

**Cases**

*Al Bahlul v. United States,*
  967 F.3d 858 (D.C. Cir. 2020) ..................................................................31

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) .............................................................40, 41

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ..............................................................41

*Am. Wild Horse Preservation Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017) ...........................................................18, 19

*Amoco Prod'n Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ....................................................................................42

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
  280 F. Supp. 3d 59 (D.D.C. 2017) ............................................................42

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
  928 F.3d 1102 (D.C. Cir. 2019) ................................................................42

*Bayer HealthCare, LLC v. FDA,*
  942 F. Supp. 2d 17 (D.D.C. 2013) ............................................23, 41, 43

*Biovail Corp. v. FDA,*
  448 F. Supp. 2d 154 (D.D.C. 2006) ..........................................................42

*Bluewater Network v. EPA,*
  370 F.3d 1 (D.C. Cir. 2004) ......................................................................18

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ........................................................................................27

*\*Chiayu Chang v. USCIS,*
  289 F. Supp. 3d 177 (D.D.C. 2018) ...........................................17, 18, 19

*Citizens for Resp. & Ethics in Washington v. FEC,*
  209 F. Supp. 3d 77 (D.D.C. 2016) ......................................................18, 25

*City of Stoughton v. EPA,*
  858 F.2d 747 (D.C. Cir. 1988) ..................................................................24

*Damus v. Nielsen,*
  313 F. Supp. 3d 317 (D.D.C. 2018) ..........................................................39

*Doolin Sec'y Sav. Bank v. Office of Thrift Supervision,*
  139 F.3d 203 (D.C. Cir. 1998) ............................................................36, 37

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ....................................................................................42

---

[*]    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Eco Tour Adventures, Inc. v. Zinke*,
   249 F. Supp. 3d 360 (D.D.C. 2017)............................................................40

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).................................................................................16, 18

*Envtl. Def. Fund v. EPA*,
   922 F.3d 446 (D.C. Cir. 2019).................................................................16, 18

*Esch v. Yeutter*,
   876 F.2d 976 (D.C. Cir. 1989)........................................................................40

*FEC v. Legi-Tech, Inc.*,
   75 F.3d 704 (D.C. Cir. 1996)..........................................................................36

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985).........................................................................................40

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010).........................................................................................30

*Freytag v. Commissioner*,
   501 U.S. 868 (1991)...................................................................................26, 32

*Fund for Animals, Inc. v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993).....................................................................43

*Fund for Animals v. Williams*,
   391 F. Supp. 2d 191 (D.D.C. 2005)................................................................23

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018)..................................................................20, 23

*Hill Dermaceuticals, Inc. v. FDA*,
   524 F. Supp. 2d 5 (D.D.C. 2007)....................................................................42

*Illinois Commerce Comm'n v. ICC*,
   749 F.2d 875 (D.C. Cir. 1984)........................................................................26

*Intercoll. Broad. Sys. V. Copyright Royalty Bd.*,
   796 F.3d 111 (D.C. Cir. 2015)........................................................................36

*Ivy Sports Med., LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014)..........................................................................35

*\*Kent Cnty., DE Levy Ct. v. EPA*,
   963 F.2d 391 (D.C. Cir. 1992)..................................................................23, 24

*Kiakombua v. Wolf*,
   498 F. Supp. 3d 1 (D.D.C. 2020)..............................................................40, 41

*Lucia v. SEC*,
   585 U.S. 237 (2018)..........................................................................27, 28, 36

**Cases—continued**

*M.G.U. v. Nielsen,*
325 F. Supp. 3d 111 (D.D.C. 2018) ........................................................43

*Magwire v. Tyler,*
66 U.S. (1 Black) 195 (1861) ..................................................................34

*\*Moose Jooce v. FDA,*
2020 WL 680143 (D.D.C. Feb. 11, 2020) ......................................28, 36, 37, 38

*Moose Jooce v. FDA,*
981 F.3d 26 (D.C. Cir. 2020) ..................................................................28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ..........................................................................17, 23

*In re Mylan N.V. Sec. Litig.,*
2023 WL 3539371 (W.D. Pa. May 18, 2023) ..............................................3

*Nat'l Env'tl Dev. Ass'n's Clean Air Project v. EPA,*
752 F.3d 999 (D.C. Cir. 2014) ................................................................26

*Nat'l Lifeline Ass'n v. FCC,*
921 F.3d 1102 (D.C. Cir. 2019) ......................................................16, 20, 23

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................................42

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior,*
344 F. Supp. 3d 355 (D.D.C. 2018) ..........................................................41

*POM Wonderful LLC v. Coca-Cola Co.,*
573 U.S. 102 (2014) ............................................................................43

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
237 F.3d 1359 (Fed. Cir. 2001) ..............................................................42

*Radio-Television News Dirs. Ass'n v. FCC,*
184 F.3d 872 (D.C. Cir. 1999) ................................................................41

*Ramirez v. U.S. Immigr. & Customs Enf't,*
568 F. Supp. 3d 10 (D.D.C. 2021) ..........................................................42

*Ryder v. United States,*
515 U.S. 177 (1995) ............................................................................26

*Shands Jacksonville Med. Ctr. V. Burwell,*
139 F. Supp. 3d 240 (D.D.C. 2015) ..........................................................40

*Sierra Club v. Van Antwerp,*
560 F. Supp. 2d 21 (D.D.C. 2008) ..........................................................35

*Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.,*
680 F. Supp. 2d 62 (D.D.C. 2010) ..........................................................42

**Cases—continued**

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard,*
    357 F. Supp. 3d 30 (D.D.C. 2019) ..................................................................18, 20

*Stand Up for Cal.! V. U.S. Dep't of Interior,*
    315 F. Supp. 3d 289 (D.D.C. 2018) .....................................................................17

*Teva Pharms., USA, Inc. v. Leavitt,*
    548 F.3d 103 (D.C. Cir. 2008) ...............................................................................5

*U.S. Chamber of Commerce v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) .............................................................................18

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) ........................................................................................ *passim*

*United States v. Barr Lab'ys, Inc.,*
    812 F. Supp. 458 (D.N.J. 1993) ...........................................................................42

*United States v. Concord Mgmt. & Consulting LLC,*
    317 F. Supp. 3d 598 (D.D.C. 2018) .....................................................................28

*United States v. Perkins,*
    116 U.S. 483 (1886) .............................................................................................29

*United Steel v. MSHA,*
    925 F.3d 1279 (D.C. Cir. 2019) ...........................................................................40

*Vanda Pharms. Inc. v. United States,*
    169 Fed. Cl. 196 (2024) .......................................................................................24

*ViroPharma, Inc. v. Hamburg,*
    898 F. Supp. 2d 1 (D.D.C. 2012) ...........................................................................5

*Wilkes-Barre Hosp. Co. v. NLRB,*
    857 F.3d 364 (D.C. Cir. 2017) ..................................................................36, 37, 38

**Constitutional Provisions, Statutes, and Reorganization Plans**

U.S. Const. art. II, § 2, cl. 2 ....................................................................3, 27, 29

5 U.S.C.
    § 703.....................................................................................................................42
    § 706.......................................................................................................................3
    § 706(2)(A) ...............................................................................................15, 26, 40
    § 706(2)I................................................................................................................26
    § 2102(a) ...............................................................................................................30
    § 2105...................................................................................................................31
    § 3132(a)(2) ..........................................................................................................30

7 U.S.C. § 610(a) ...................................................................................................29

20 U.S.C. § 3461(a) ...............................................................................................29

**Constitutional Provisions, Statutes, and Reorganization Plans—continued**

21 U.S.C.

§ 331................................................................................................................27

§ 331(d)...............................................................................................3, 27, 42

§ 333................................................................................................................27

§ 355................................................................................................................27

§ 355(a).............................................................................................3, 27, 42

§ 355(b)(1).......................................................................................................3

§ 355(d)(1).......................................................................................................4

§ 355(j)........................................................................................................5, 41

§ 355(j)(2)....................................................................................................1, 5

§ 355(j)(2)(A)(iv)....................................................................................5, 20, 26

§ 355(j)(4).......................................................................................................5

§ 355(j)(4)(A)......................................................................................5, 24, 25

§ 355(j)(4)(F)...................................................................................16, 20, 26

§ 355(j)(8)(B)................................................................................................22

§ 355(j)(8)(B)(i)........................................................................................6, 14

§ 379d-3a.........................................................................................29, 30, 31

§ 379d-3a(a)............................................................................................31, 32

42 U.S.C. § 913..............................................................................................29

49 U.S.C. § 323(a)..........................................................................................29

Reorganization Plan No. 1 of 1939, 53 Stat. 1423.................................32

Reorganization Plan No. 3 of 1946, 60 Stat. 1097.................................32

Reorganization Plan No. 1 of 1953, 67 Stat. 631...................................32

Reorganization Plan No. 3 of 1966, 80 Stat. 1610.................................32

**Regulations**

21 C.F.R.

§ 7.45(a)(3)....................................................................................................43

§ 10.30(e)(2)..................................................................................................15

§ 10.33(a).......................................................................................................34

§ 314.3.....................................................................................................passim

§ 314.50...........................................................................................................4

§ 314.50(d).......................................................................................................4

§ 314.94...........................................................................................................5

§ 314.105.........................................................................................................4

§ 314.126.........................................................................................................4

§ 314.127.........................................................................................................5

§ 320.21(b).......................................................................................................5

§ 320.23(b)(1)...................................................................................6, 26, 41

§ 320.24(a).......................................................................................................8

§ 320.24(b).......................................................................................................8

§ 320.24(b)(1)(i)..............................................................................................8

**Agency Guidance**

Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018)......................................32

FDA, FDA Compliance Program 7346.832 ch. 46 (2022)............................................24

FDA, FDA Compliance Program 7348.004 ch. 48 (2018)............................................25

*FDA, *Draft Guidance: Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA* (2021) ..........................................6, 8, 17, 20

*FDA, *Draft Guidance for Industry, Bioavailability for Industry, Bioavailability and Bioequivalence Studies for Orally Administered Drug Products*, 2003 WL 24014257 (Mar. 1, 2003)............................................................9, 12, 20

FDA, *Draft Guidance for Industry, Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted under an ANDA* (Dec. 2013)............................................9, 16

FDA, *Draft Guidance on Tasimelteon* (Sept. 2015)..............................................2, 10

FDA, *FDA Takes Important Steps to Increase Racial and Ethnic Diversity in Clinical Trials* (Apr. 13, 2022) ....................................................................8

FDA, *Guidance for Industry, E10 Choice of Control Group and Related Issues in Clinical Trials* (2001) .................................................................8, 19

*FDA, *Information Requests and Discipline Review Letters under GDUFA* (Oct. 2022) .................................................................27, 33, 35, 36

FDA, *M13A Bioequivalence for Immediate-Release Solid Oral Dosage Forms* (Jan. 2023)...........................................................................9

FDA Interim Response to Citizen Petition, Docket No. FDA-2023-P-1985 (Nov. 8, 2023) ....................................................15, 38

FDA, *FDA Staff Manual Guide* § 1410.104(1)(D)(1)(a) (effective June 12, 2012)....................33

FDA, *FDA Staff Manual Guides, Vol. II: Approval of New Drug Applications and Their Supplements* (June 12, 2012)................................................37, 39

*Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs*, 58 Fed. Reg. 39,406 (July 22, 1993) ................................7, 8, 9

SES Positions That Were Career Reserved During CY 2012, 78 Fed. Reg. 28,296 (May 14, 2013) ......................................................30

SES Positions That Were Career Reserved During CY 2016, 82 Fed. Reg. 55,158 (Nov. 20, 2017)........................................................30

**Other Authorities**

Citizen Petition re: ANDA No. 211654, Dkt. No. FDA-2023-P-1985 (May 16, 2023) .......................................................14

*English Translation of Attachment 1 of PSEHB/PED Administrative Notice: Guideline for Bioequivalence Studies of Generic Products* (Japan) (2020) ............................10

FDA, *Drugs@FDA: FDA-Approved Drugs: Products on ANDA 211654* ..................................40

**Other Authorities—continued**

Gov't Accountability Office, *Agency-Wide Workforce Planning Needed to Ensure Medical Product Staff Meet Current and Future Needs* (Jan. 2022).......................................31

Gov't Accountability Office, *Drug Safety: Most Drugs Withdrawn in Recent Years Had Greater Health Risks for Women* (Jan. 19, 2001)..............................................7, 43

*Highlights of Prescribing Information, Tasimelteon-Tasimelteon Capsule: Amneal Pharmaceuticals NY LLC*, DailyMed .......................................................................40

Katherine Eban, *Bottle of Lies: The Inside Story of the Generic Drug Boom* (2019) ..............2, 24

Steven W. Lockley et al., *Tasimelteon for Non-24-Hour Sleep-Wake Disorder in Totally Blind People (SET and RESET): Two Multicentre, Randomized, Double-Masked, Placebo-Controlled Phase 3 Trials*, 386 Lancet 1754 (Aug. 5, 2015).......................4

World Health Organization, *Fifty-first Report of the WHO Expert Committee on Specifications for Pharmaceutical Preparations* 198 § 7.2.4 (2017) .......................................9

## GLOSSARY OF ABBREVIATIONS

**ANDA:**  abbreviated new drug application

**APA:**  Administrative Procedure Act

**BE:**  bioequivalence

**FDA:**  Food and Drug Administration

**FDCA:**  Federal Food, Drug, and Cosmetic Act

**MSN:**  MSN Pharmaceuticals, Inc.

**NDA:**  new drug application

## INTRODUCTION

The Federal Food, Drug, and Cosmetic Act (FDCA) permits a generic drug manufacturer to bypass the expensive and time-consuming process of demonstrating through clinical testing and other evidence that the drug is safe and effective. But a generic drug manufacturer may only take that shortcut if it "shows" in an abbreviated new drug application (or ANDA) that its proposed generic drug is the same as the already-approved drug—commonly referred to as the "reference listed drug"—across a set of measures specified by Congress. Most critically, the generic drug manufacturer must "show" through its ANDA that the drug is "bioequivalent"—*i.e.*, that the rate and extent of the drug's chemical absorption is not significantly different than the reference listed drug it is mimicking. 21 U.S.C. § 355(j)(2).

Showing bioequivalence is the touchstone of the ANDA process. If an ANDA applicant fails to demonstrate bioequivalence through appropriately designed clinical and laboratory studies, there is no way for the public to know whether the generic drug the manufacturer seeks to distribute in the U.S. market will be as safe and as effective as the reference listed drug. A fundamental tenet of generic drug testing is that bioequivalence studies should be conducted in a population that is representative of the patient population the proposed generic drug is intended to treat. FDA's own guidance confirms this. Indeed, FDA has consistently informed ANDA applicants that an appropriately designed bioequivalence study must include subjects who reflect the demographics of the intended patient population—*i.e.*, if the patient population is the U.S. public, an appropriate study must be diverse across gender and race. This is required to show that, for the population as a whole, a generic drug will behave in the same way as the reference listed drug.

FDA recently approved ANDA No. 211654, an application sponsored by MSN Pharmaceuticals, Inc. (MSN), seeking to market a generic version of Hetlioz® (tasimelteon). But MSN's study purporting to show such bioequivalence only tested the proposed generic drug in 44 Asian men. MSN included *no women and no non-Asian men* in the sole bioequivalence study supporting

1

its application to market its generic tasimelteon product to men and women in the U.S. public. It did so, despite FDA specifically directing the inclusion of females and racial and ethnic diversity in bioequivalence studies for this specific drug product:

> Subjects: Healthy males and nonpregnant females, general population

AR8541 (FDA, *Draft Guidance on Tasimelteon* (Sept. 2015)).

Yet FDA inexplicably concluded that the study satisfied the agency's demographic and other study-design standards, and ultimately approved MSN's ANDA, in plain contravention to its own regulations, guidance, and widely accepted principles of bioequivalence. Indeed, when FDA specifically considered whether the demographic profile of MSN's study subjects satisfied FDA guidance, the reviewer answered, "Yes"—even though it clearly did not:

> Is the demographics profile of subjects completing the bioequivalence study in agreement with the current drug product recommendation? If no, please comment.    ☒ Yes    ☐ No

AR8518.

FDA also overlooked further deficiencies in the study's design, including MSN's failure to blind the study, investigator findings that the study site did not test blood properly, and serious discrepancies with the study results. Those data discrepancies reflect either that the listed drug used as the reference in MSN's study was not actually Vanda's approved drug Hetlioz® or that systematic errors infected the study. Neither is acceptable under the FDCA and FDA regulations.

Unfortunately, FDA's decision to approve MSN's ANDA in the face of these deficiencies reflects of a troubling pattern of inconsistency and botched oversight by FDA in its assessment of generic drug applications, despite the central role that Congress directs the agency to play in ensuring such drugs are effective and safe for human consumption. *See* Katherine Eban, *Bottle of Lies: The Inside Story of the Generic Drug Boom* (2019) (publishing a decade-long investigation into generic drug production, especially by overseas manufacturers, finding routine falsifications

of data and failures by FDA to properly police generics); *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*7 (W.D. Pa. May 18, 2023) (describing Eban's "exhaustive independent investigative effort"). FDA's failure to adhere to the FDCA, its own regulations, and the standards set forth in its guidance governing bioequivalence constitutes a risk to public health.

FDA's acceptance of MSN's bioequivalence study and the resulting approval of MSN's ANDA for generic tasimelteon was arbitrary and capricious and contrary to the requirements of the FDCA, all in violation of the APA. *See* 5 U.S.C. § 706. FDA's approval of MSN's ANDA was also unlawful for the independent reason that it violated the Appointments Clause of the U.S. Constitution and FDA regulations: the FDA employees who purported to exercise the significant authority of approving MSN's ANDA pursuant to the laws of the United States, allowing MSN's generic drug product to enter the U.S. market, were not appointed by the President, a court of law, or the head of a department (U.S. Const. art. II, § 2, cl. 2) nor delegated authority in compliance with FDA process. The Court should grant summary judgment to Vanda, declare FDA's approval of MSN's ANDA unlawful, vacate the unlawful approval, and compel FDA to initiate a recall.

## BACKGROUND

### A.    FDA's approval of Vanda's NDA

Vanda is the sponsor of NDA No. 205677 for Hetlioz® (tasimelteon). Hetlioz® was the first FDA-approved therapy to treat two rare, debilitating disorders: Non-24-Hour Sleep-Wake Disorder (Non-24) and nighttime sleep disturbances in Smith-Magenis Syndrome (SMS) patients 16 years or older. *See* AR8530, 8618-8620.

**1.**   Vanda secured approval to market Hetlioz® through the onerous new drug application (or NDA) process. The FDCA generally prohibits introducing or delivering for introduction a "new drug" into the United States without prior approval from FDA. 21 U.S.C. §§ 331(d), 355(a). If an applicant is the first to market a drug—like Vanda with Hetlioz®—the applicant must submit an NDA (*id.* § 355(b)(1)), an extensive filing (*see id.* § 355(b)(1)(A)-(G) (NDA filing requirements);

21 C.F.R. § 314.50 (same)). Among many other things, an approvable NDA must provide substantial evidence to demonstrate that the drug will be safe and effective for the proposed use. 21 U.S.C. § 355(d)(1); 21 C.F.R. §§ 314.126, 314.50(d). Only after FDA has determined that a drug manufacturer's NDA meets the various statutory and regulatory standards for safety and effectiveness and approves the information on the proposed label may the sponsor market the drug for the approved indication(s). *See* 21 C.F.R. § 314.105 (approval process for drug applications).

**2.** To support its original NDA for Hetlioz® to treat Non-24, Vanda provided safety data from 22 clinical studies—14 Phase I studies, two Phase II studies and six Phase III studies—in which 1,346 human subjects "received at least one dose of tasimelteon." Ex. 1, FDA, *Appl. No.: 205677Orig1s000 Clinical Pharmacology and Biopharmaceutics Review(s)* 7-9 (Dec. 4, 2013), perma.cc/KP2L-NFXC (Hetlioz® Clin. Pharm. & Biopharm. Review(s)). Those clinical trials included two clinical studies (SET and RESET) in male and female subjects who have Non-24. *Id.* at 9-11.[2]

Vanda also conducted pharmacokinetic studies to determine the absolute bioavailability of tasimelteon and to discover whether there are any age-based and sex differences in bioavailability. *See* AR596. Vanda found that the absolute bioavailability of tasimelteon after oral administration was 38.3% and that tasimelteon is extensively metabolized. AR595. Vanda also submitted Study 003, which had assessed the effects of age and gender on tasimelteon's pharmacokinetics. Study 003 enrolled 40 subjects: 20 females and 20 males, with an even distribution of young and elderly

---

[2]    As FDA would know from Vanda's NDA, Vanda's studies included members of both sexes and of different races. The SET study involved 84 subjects; 58% were male and 42% were female. Steven W. Lockley et al., *Tasimelteon for Non-24-Hour Sleep-Wake Disorder in Totally Blind People (SET and RESET): Two Multicentre, Randomized, Double-Masked, Placebo-Controlled Phase 3 Trials*, 386 Lancet 1754, 1758 (Aug. 5, 2015). The subjects' racial backgrounds included American Indian or Alaska Native, Asian, Black, white, and Other. *Id.* The RESET study involved 20 subjects; 60% were male and 40% were female. *Id.* The subjects' racial background was predominantly white, with two subjects identifying as Black or "Other." *Id.*

patients. Ex. 1, Hetlioz® Clin. Pharm. & Biopharm. Review(s).[3] Study 003 found that young females experience 20% to 30% greater exposure to tasimelteon than young males. *Id.* at 17; AR596 (Hetlioz® Label).

### B.    FDA's unlawful approval of MSN's ANDA

#### 1.    *Legal and regulatory background*

In contrast to the long and costly NDA process, manufacturers of generic drugs may seek approval through an abbreviated new drug application (or ANDA), in which they "piggyback[] on the original manufacturer's evidence of safety and efficacy." *Teva Pharms., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008); 21 U.S.C. § 355(j). While ANDA applicants need not submit clinical evidence to establish the safety and effectiveness of the generic drug, the ANDA applicant must show that its proposed generic drug is effectively the same as the reference listed drug. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(v), (4)(B)-(G); 21 C.F.R. §§ 314.94, 314.127.

Most critically, an ANDA must show that the generic drug is "bioequivalent" to the reference listed drug. 21 U.S.C. § 355(j)(2)(A)(iv); 21 C.F.R. §§ 314.94, 314.127, 320.21(b); *see also, e.g.*, *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 9 n.2 (D.D.C. 2012) ("FDA requires data on bioequivalence" to approve an ANDA). The FDCA also requires, among other things, that an ANDA show the "methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A). The FDA will allow the generic drug to be marketed based on the agency's prior determination that the reference listed drug is safe and effective only if an ANDA includes evidence sufficient to meet these criteria. *Id.* § 355(j)(4).

#### a.    *General principles of bioequivalence*

According to Congress, a drug is bioequivalent to another if "the rate and extent of

---

[3]    As FDA would know from Vanda's NDA, Study 003 also included a diverse population—with 62.5% of subjects identifying as white, 25% as Black, 7.5% as Hispanic/Latino, and 5% as Asian/Pacific Islander. Roth Decl. ¶ 4.

absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses." 21 U.S.C. § 355(j)(8)(B)(i).[4]

Bioequivalence, as defined by the FDCA and FDA, is dependent on the "rate and extent" of a drug's absorption. 21 U.S.C. § 355(j)(8)(B)(i); 21 C.F.R. § 314.3. "Absorption" is the process by which a drug moves from the site of administration into systemic circulation. The *rate* of absorption largely drives the onset of drug action while the *extent* of absorption largely determines the intensity of drug action. *See* FDA, *Draft Guidance: Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA* 6 (2021), perma.cc/HHA4-6PRX (2021 FDA BE Guidance).

To collect information about the rate and extent of absorption, a pharmacokinetic study involves administering a drug and taking blood samples from the subject at specific points in time (e.g., once pre-dose and then 12 to 18 times post-dose). 2021 FDA BE Guidance, *supra*, at 3. The rate and extent of absorption are typically measured using pharmacokinetic endpoints, such as $C_{max}$ and AUC (area under curve), in an "accessible biological matrix (such as whole blood, plasma, and/or serum)." *Id.* at 3, 6. $C_{max}$ is the maximum plasma concentration of the drug—*i.e.*, the "rate" of absorption. *Id.* at 39. AUC (area under curve) is a measure of the total systemic exposure to the drug over time, either over a specified time period ($AUC_t$) or over infinite time ($AUC_\infty$)—*i.e.*, the "extent" of absorption. *Id.* at 3, 6, 39. If a proposed generic product's $C_{max}$ and $AUC_\infty$ fall within 80-125% of the listed drug's, FDA will typically conclude that the proposed generic is bioequivalent to the listed drug. *Id.* at 23.

---

[4]  FDA regulations similarly provide that, to demonstrate bioequivalence, there must be a showing of "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study." 21 C.F.R. § 314.3; *id.* § 320.23(b)(1).

The rate and extent of drug absorption varies in humans due to biological, physiochemical, metabolic, and biochemical factors. *See* AR644 (recognizing that "intrinsic factors" in humans "may result in different responses to a drug in different populations"); *Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs*, 58 Fed. Reg. 39,406, 39,406 (July 22, 1993) (1993 FDA Guidance) ("A number of demographic characteristics may affect pharmacokinetics.").

### b. *Effect of sex on bioequivalence*

There is wide agreement that differences between males and females affect a drug's bioavailability and, as a result, bioequivalence needs to be established in males and females. 1993 FDA Guidance, *supra*, 58 Fed. Reg. at 39,406; AR636-640 (explaining that the bioavailability of a drug product affects both efficacy and safety).

FDA has itself described these differences. For example, as early as its 1993 guidance, FDA observed that "women metabolize certain substances at rates different from men" and that "[g]ender-related variations in drug effects may arise from a variety of sources. Some of these are specifically associated with gender, e.g., effects of endogenous and exogenous hormones." 1993 FDA Guidance, *supra*, 58 Fed. Reg. at 39,409.

These differences have clinical significance: Differing rates and extents of absorption may result on the one hand in less effectiveness and on the other hand in an increased risk of adverse reactions. *See* AR636-640 (explaining that the bioavailability of a drug product affects both efficacy and safety). In fact, eight of the ten drugs withdrawn from the market over the years 1997 to 2000 were withdrawn due to risks of adverse effects in females. Gov't Accountability Office, *Drug Safety: Most Drugs Withdrawn in Recent Years Had Greater Health Risks for Women* (Jan. 19, 2001), perma.cc/VJ3D-LU6S.

### c. *Effect of race on bioequivalence*

Similarly, there is ample evidence that people of different races and ethnicities may have

differing pharmacokinetic characteristics. *See* 1993 FDA Guidance, *supra*, 58 Fed. Reg. at 39,406 ("ethnic groups differ in the prevalence of metabolic abnormalities such as slow acetylation and G6PD deficiency"); AR644.

As early as 1993, FDA had noted that "[d]ocumented subgroup pharmacodynamic differences … have been observed," including a potential "increased sensitivity to beta-blockers in Asians" and "decreased responsiveness to the blood pressure-lowering effects of adrenocortical extract (ACE) inhibitors and beta-blockers in African-Americans." 1993 FDA Guidance, supra, 58 Fed. Reg. at 39,407.[5]

### d.    *FDA guidance on bioequivalence studies*

FDA has distilled the principles described above into guidance for ANDA applicants.

**Study design.** To show bioequivalence, FDA regulations require using "the most accurate, sensitive, and reproducible approach available among those set forth" in 21 C.F.R. § 320.24(b). *Id.* § 320.24(a). That generally means an "in vivo test in humans in which the concentration of the active ingredient or active moiety … in whole blood, serum, or other appropriate biological fluid is measured as a function of time." *Id*. § 320.24(b)(1)(i). For immediate-release, orally administered drugs like Hetlioz®, FDA specifically recommends that ANDAs use an in vivo, nonreplicated, single-dose, crossover pharmacokinetic study. 2021 FDA BE Guidance, *supra*, at 5.

**Blinding.** FDA calls for studies to be double-blind—*i.e.*, neither the subject nor the investigator knows which treatment is administered to which subject—to "minimize the potential biases resulting from differences in management, treatment, or assessment of patients, or interpretation of results." FDA, *Guidance for Industry, E10 Choice of Control Group and Related Issues in Clinical Trials* 4 (2001) (2001 FDA Guidance); *see also* AR697-698.

---

[5]    And FDA has continued to recognize that not insisting on racial and ethnic diversity in studies risks approving a treatment that is "more or less toxic for one racial or ethnic group than another" and/or "less effective for certain groups. FDA, *FDA Takes Important Steps to Increase Racial and Ethnic Diversity in Clinical Trials* (Apr. 13, 2022), perma.cc/E67P-3JKB.

***Study population demographics.*** For at least three decades, FDA's guidance has instructed that "patients included in clinical studies should, in general, reflect the population that will receive the drug when it is marketed." 1993 FDA Guidance, *supra*, 58 Fed. Reg. at 39,410; *id.* at 39,409 (in light of qualitative and quantitative differences in how drugs behave in demographic subsets of the population, drug "sponsors are expected to include a full range of patients in their studies").

In particular, FDA has recognized the importance of including representative proportions of subjects of each sex and race. Indeed, FDA guidance on bioequivalence studies has admonished that bioequivalence studies for drugs "should be representative of the general population, taking into account age, sex, and race" and that "[i]f a drug product is intended for use in both sexes, the applicant should include similar proportions of males and females in the study." FDA, *Draft Guidance for Industry, Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted under an ANDA* 4-5 (Dec. 2013), perma.cc/H785-ATEA (2013 FDA Guidance); *see also* 1993 FDA Guidance, *supra*, 58 Fed. Reg. at 39,410 ("There is no regulatory or scientific basis for routine exclusion of women from bioequivalence trials."); FDA, *Draft Guidance for Industry, Bioavailability for Industry, Bioavailability and Bioequivalence Studies for Orally Administered Drug Products*, 2003 WL 24014257, at *7 (Mar. 1, 2003) (2003 FDA Guidance) ("This guidance recommends that in vivo [bioequivalence] studies be conducted in individuals representative of the general population, taking into account age, sex, and race. We recommend that if the drug product is intended for use in both sexes, the sponsor attempt to include similar proportions of males and females in the study.").[6]

---

[6]    FDA's guidance is consistent with other organizations' recommendations and the general scientific consensus. For example, FDA helped develop similar guidance for the International Council for Harmonisation of Technical Requirements, which recommends that, "[i]f a drug product is intended for use in both sexes, it is recommended the study include male and female subjects." FDA, *M13A Bioequivalence for Immediate-Release Solid Oral Dosage Forms* 3 (Jan. 2023), perma.cc/6MUM-TEUA. The World Health Organization likewise recommends that, "[i]f the pharmaceutical product is intended for use in both sexes, the sponsor should include both males and females in the [bioequivalence] study." WHO, *Fifty-first Report of the WHO Expert Committee*

*Tasimelteon-specific guidance.* FDA has also issued tasimelteon-specific guidance, directing that any bioequivalence study include male and female subjects in the general population.

> Subjects: Healthy males and nonpregnant females, general population

AR8541 (FDA, *Draft Guidance on Tasimelteon* (Sept. 2015)).

### 2.    *MSN's ANDA No. 211654*

In 2018, MSN submitted ANDA No. 211654 seeking approval to market a generic version of tasimelteon for the indication of Non-24. AR8618 (Approval Letter (Jan. 12, 2023)).

In support of its ANDA, MSN submitted a bioequivalence study purporting to show that its product is bioequivalent to Hetlioz®. AR8466 (MSN BE Review). MSN originally performed a "pilot study," a single-dose, randomized, two-treatment, two period study in 15 male subjects, that failed to meet the acceptable bioequivalence range of 80-125%. AR8469, 8513. The failed pilot study prompted MSN to redesign its study to show bioequivalence. MSN's "pivotal" bioequivalence study was conducted in India, and was an "open-label, randomized, balanced, single oral dose, two treatment, three-sequence, three-period, reference replicate bioequivalence study." AR8483-8487. The study included only Asian males—no females or other ethnicities. *See* AR8479, 8488. MSN tested batches of its generic tasimelteon and a purported batch described as Hetlioz® capsules from Lot No. 3140788. AR8479, 8484.

FDA reviewed the bioequivalence study to evaluate the ANDA. *See* AR8466-8529.

**Study-design.** As a starting point, FDA recognized that "the Product Specific Guidance for Tasimelteon Capsules, 20 mg, recommends single-dose, two-way crossover study in Healthy

---

*on Specifications for Pharmaceutical Preparations* 198 § 7.2.4 (2017), perma.cc/HFH8-PJWU.

Some countries forbid the use of test subjects who are ethnically different from the country's population if there are differences in dissolution rates between the reference and test products or "if ethnic differences in gastrointestinal physiology including the level of gastric acidity are thought to affect the evaluation of bioequivalence due to formulation characteristics." *English Translation of Attachment 1 of PSEHB/PED Administrative Notice: Guideline for Bioequivalence Studies of Generic Products* (Japan) 3 (2020), perma.cc/2QHN-YMCN.

males and nonpregnant females (general population)." AR8487. But it then overlooked several obvious deviations from this guidance, without justifying these departures. *See id.*

*First*, with respect to demographics, MSN performed its study only in Asian males. AR8488. Yet when FDA specifically considered whether the demographic profile of MSN's study subjects satisfied FDA guidance, the reviewer answered, "Yes."

| Is the demographics profile of subjects completing the bioequivalence study in agreement with the current drug product recommendation? If no, please comment. | ☒ Yes   ☐ No |
| --- | --- |

AR8518. Although MSN's study self-evidently did not comply with tasimelteon-specific guidance—directing study in males *and* "nonpregnant females" and in the "general population" (AR8541)—the reviewer provided no comment or other reason why MSN's bioequivalence study was nonetheless appropriately designed. *See generally* AR8466-8529.

*Second*, FDA recognized that MSN's pivotal study was, contrary to the product-specific guidance, done as a "partially replicated design assuming high intra-subject variability … of the reference product and based on the outcome of [a] pilot [bioequivalence] study" that MSN had conducted. AR8487. That is, because MSN's pilot study in 15 males failed to achieve an acceptable bioequivalence range (AR8469, 8513), MSN pointed to the failed pilot study to justify a different study design that did not comply with the tasimelteon-specific guidance to show bioequivalence. But the justification from the pilot study—high intrasubject variability (over 29.4%) on $C_{max}$ (meaning the rate of absorption of Hetlioz® from capsule-to-capsule varied greatly within a single individual) but not on $AUC_{0-t}$ and $AUC_{0-\infty}$ (*see* AR8125)—was the *opposite* in the pivotal study (*see* AR182 (reporting only $AUC_{0-t}$ and $AUC_{0-\infty}$ to have intra-subject variability over 29.4%)). FDA did not consider these strange results when accepting MSN's justification that the pivotal study's high-intrasubject variability outcome excused MSN from complying with the design called for by FDA guidance. *See generally* AR8466-8529.

Beyond the tasimelteon-specific guidance, FDA did not consider or explain deviations

from general FDA guidance. *First*, MSN's pivotal study was performed "open label"—meaning that it was not blinded. AR8483-8487. FDA failed to provide an explanation as to why MSN's open-label study, as opposed to the kind of double-blind study that it recommends, was adequate to satisfy its study design standards. *See id.*

*Second*, during an FDA inspection of MSN's study site, "[s]ignificant objectionable conditions were observed … that impacted the reliability of a portion of the audited studies," resulting in the inspector issuing a Form FDA 483, indicating the inspector had observed conditions "that in their judgment may constitute violations of the [FDCA]." AR8480-8481; AR8245-8249. Even though Office of Study Integrity and Surveillance (OSIS) reviewers confirmed that blood hemoglobin concentrations were not being accurately measured, impacting the reliability of the facility's data, FDA concluded "the inspectional findings were isolated in nature" and "not likely to have an impact on the outcomes of the current ANDA." AR8481-8482.

Despite these flaws, FDA concluded that "[t]he study design is adequate." AR8487; *see also* AR8501.

**Result discrepancies.** FDA reviewers also did not evaluate serious discrepancies in the results of MSN's bioequivalence study. *First*, results in MSN's study indicate either that MSN's reference product was not Vanda's Hetlioz® at all or that MSN's study was infected by systematic error. Ex. 3, Taft Decl. ¶¶ 17, 77-80, 81-98. As explained, a properly conducted bioequivalence study generates pharmacokinetic data for the proposed generic product and the already-approved listed product because the bioequivalence study must compare the data generated by the two. *See id.* ¶ 43; FDA 2003 Guidance, *supra*, at 2-3; Ex. 9, FDA 2021 BE Guidance, *supra*, at 2. Pharmacokinetic data for a reference listed drug collected during a bioequivalence study *should* track existing pharmacokinetic data for that already-approved product—assuming the bioequivalence study actually studied the listed product as the reference, used test subjects representative of the population, and was otherwise properly designed. Ex. 3, Taft Decl. ¶¶ 44, 49. In MSN's study,

however, the estimated means of the rate ($C_{max}$) and extent ($AUC_\infty$) of absorption of the reference listed drug (allegedly Hetlioz®) were elevated more than *200% above* the corresponding means reported in Vanda's Phase I clinical trial for Hetlioz®. *Id.* ¶ 17; *see also* Ex. 1, Hetlioz® Clin. Pharm. & Biopharm. Review(s) at 16-17. The same measures were likewise elevated 200% more for *the very same lot* of Hetlioz®—Lot No. 3140788—in a bioequivalence study performed by another ANDA applicant (Apotex). *Id. Compare* Ex. 2, Biopharmaceutics Review for ANDA No. 211607 at 23, 24 (Apotex BE Review),[7] *with* AR8508-8511 (MSN BE Review).

The following chart summarizes the comparison of the relevant pharmacokinetic data for Hetlioz® across these studies, plainly demonstrating the significant discrepancy:

| Table 1: Summary of Relevant Pharmacokinetic Data | | | |
|---|---|---|---|
| | Purported Testing of 20 mg Orally-administered Hetlioz® Capsules in Healthy Subjects | | |
| | (1) Vanda's Phase I Studies (FDA meta-analysis) | (2) Apotex's BE Study | (3) MSN's BE Study |
| $C_{max}$ (ng/mL) (Mean ± Standard Deviation) | 234.9 ± 127.7 | 265.4 ± 94.63 | 522.6 ± 300.1 |
| $AUC_\infty$ (ng*h/mL) (Mean ± Standard Deviation) | 411.4 ± 327.8 | 384.7 ± 177.9 | 840.8 ± 542.5 |

Ex. 3, Taft Decl. ¶ 77 tbl. 1. Vanda's and Apotex's data is reasonably similar; MSN's data is a wild departure. As Dr. David R. Taft explains, such an "unmistakable and unexpected elevation in reference product systemic exposure" calls into question the reliability of MSN's bioequivalence study and cannot be explained by random error. *Id.* ¶¶ 17, 77-80, 81-98.

---

[7]    Concurrent with this motion, Vanda is moving to supplement and complete the record, asking the Court to consider three additional documents. Two documents are FDA-created records reflecting the testing data that Vanda itself submitted with its new drug application (Ex. 1), and the testing data of another generic manufacturer, Apotex, who also tested Hetlioz® (Ex. 2). As our motion describes, both of these FDA-created records—regarding the dissolution and pharmacokinetic profile of Hetlioz®—were possessed by FDA when it considered MSN's abbreviated new drug application (ANDA). The third document is a declaration by Dr. Taft (Ex. 3), which describes the importance of the materials that FDA has improperly excluded from the administrative record.

*Second*, the clinical study report for MSN's pivotal study shows a statistically significant "period effect" for both the $C_{max}$ and AUC parameters. AR217-218. To explain, MSN's study evaluated subjects over three dosing periods, with 2/3 of subjects taking a Hetlioz® dose and 1/3 taking an MSN dose each period, until each person took 2 Hetlioz® doses and 1 MSN dose. A statistically significant period effect means that differences in pharmacokinetic results between one period of study and another period were almost certainly not due to random error. Because such a result suggests a flawed experiment in which there were not "similar experimental conditions" across periods (21 U.S.C. § 355(j)(8)(B)(i)), MSN knew it needed to find some putative justification. *See* AR217-218. After concluding there were no *physical* differences in conditions, MSN blamed the observed discrepancy in the drug levels in the blood on the "psychological status" of the subjects, *i.e.*, according to MSN, the rate and extent of physical absorption into the blood significantly differed based on the mental or emotional status of a given healthy volunteer at different times. *Id.*

FDA tentatively approved MSN's application on May 28, 2020, and granted final approval on January 12, 2023. AR8618.

### C.    Relevant procedural history

Vanda submitted a FOIA request to FDA for a copy of the bioequivalence review for MSN's ANDA on January 27, 2023. Compl. ¶ 92. Vanda received the review on March 22, 2023.

After reviewing the bioequivalence review, Vanda filed a citizen petition with FDA on May 16, 2023, requesting that the agency revoke its approval of MSN's ANDA and order a recall of MSN's product. *See* Citizen Petition re: ANDA No. 211654, Dkt. No. FDA-2023-P-1985 (May 16, 2023). Although Vanda's citizen petition requested immediate action by FDA (*id.* at 3, 17), aside from assigning a docket number, FDA failed to take immediate action.

On September 25, 2023, Vanda filed this action, seeking an order declaring FDA's approval of MSN's ANDA unlawful, and setting aside the same, and compelling the agency to

initiate a recall MSN's generic tasimelteon product. Just before its 180-day deadline to respond to Vanda's citizen petition (21 C.F.R. § 10.30(e)(2)), FDA issued an "interim response" asserting it had been "unable to reach a decision on your petition because it raises complex issues requiring extensive review and analysis by Agency officials." FDA Interim Response to Vanda's Citizen Petition, Docket No. FDA-2023-P-1985 (Nov. 8, 2023). As Vanda explained in opposing FDA's motion to dismiss (ECF No. 18), the pending citizen petition is no barrier to this Court's review, and Vanda now moves for summary judgment seeking vacatur of FDA's unlawful approval of MSN's ANDA.

## ARGUMENT

FDA's approval of MSN's ANDA was arbitrary and capricious, contrary to law, and in excess of statutory authority. *First*, MSN's study design is contrary to FDA guidance requiring representation of the sexes and racial and ethnic diversity. And FDA's explanation for that defect—that MSN *had* complied with the guidance—is fatally flawed. *Second*, FDA approved MSN's ANDA despite its data reflecting rates and extent of absorption fully *200% higher* for its purported Hetlioz® than Vanda's data for Hetlioz® and even for Apotex's data for the same lot of Hetlioz®. This is all the more concerning in light of an investigator finding MSN's study site "objectionable." *Third*, FDA's decision violated the Appointments Clause and FDA's own delegations of authority because it was signed by an individual who cannot lawfully do so—and FDA's purported *post hoc* ratification fails under D.C. Circuit precedent.

Because the "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" (5 U.S.C. § 706(2)(A)), the Court should enter summary judgment for Vanda, vacate FDA's unlawful approval of MSN's ANDA, and order a recall of MSN's unlawfully approved tasimelteon product.

## I. FDA'S APPROVAL OF MSN'S ANDA WAS UNLAWFUL BECAUSE IT FAILED TO SHOW BIOEQUIVALENCE.

FDA's finding that MSN's ANDA sufficiently "show[ed]" bioequivalence (21 U.S.C. § 355(j)(4)(F)) is arbitrary and capricious and contrary to law. FDA improperly accepted an inadequately designed bioequivalence study and entirely failed to address manifest data flaws.

### A. FDA's conclusion that MSN's bioequivalence study was "appropriately designed" was arbitrary and capricious.

Bioequivalence must be shown through "an appropriately designed study." 21 C.F.R. § 314.3. FDA's conclusion that MSN's sole study purporting to show bioequivalence—a non-blinded study that included only 44 Asian men subjects—was "appropriately designed" was arbitrary and capricious. Agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (*Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019)); "offers inaccurate or unreasoned justifications for a decision" (*Envtl. Def. Fund v. EPA*, 922 F.3d 446, 454 (D.C. Cir. 2019)); or is the product of "unexplained inconsistency in agency policy" (*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-222 (2016)). FDA's finding that MSN's ANDA included an "appropriately designed" study suffers all these flaws.

### 1. FDA disregarded settled and tasimelteon-specific guidance requiring representation of the sexes and racial and ethnic diversity.

The bioequivalence study essential to MSN's ANDA did not follow FDA's longstanding requirements—there was no gender or racial diversity. In asserting that MSN nonetheless *did* comply with the regulatory requirement, and in offering no further analysis, FDA acted unlawfully.

**a.** MSN plainly violated FDA's longstanding requirements. Indeed, for decades, FDA's guidelines and guidance documents have directed that bioequivalence studies for drugs "should be representative of the general population, taking into account age, sex, and race." 2013 FDA

Guidance, *supra*, at 4; *see supra* at 9-10.[8] Thus, "unless otherwise recommended" in product-specific guidance, if "a drug product is intended for use in both sexes, the applicant should include similar proportions of males and females in the study or provide a justification supporting the use of a single-sex population." 2021 FDA BE Guidance, *supra*, at 4-5. And in its review of MSN's bioequivalence study, FDA specifically acknowledged that FDA's tasimelteon-specific guidance directs applicants to conduct their bioequivalence studies in "[h]ealthy males and nonpregnant females (general population)." AR8487, 8500; *see* AR8541.

Here, MSN sought approval to market its generic tasimelteon to treat individuals with Non-24, a disorder that affects males and females alike and that affects members of all races and ethnicities. Under longstanding FDA policy *and* its tasimelteon-specific policy setting out what constitutes an appropriately designed study, MSN's bioequivalence study should have "include[d] similar proportions of males and females" and should have reflected the patient population it seeks to treat. 2021 FDA BE Guidance, *supra*, at 4-5; AR8487, 8500. MSN's bioequivalence study, however, included no females nor any population other than Asian males.

Thus, under FDA's clear, longstanding requirements, MSN's bioequivalence study was *not* an "appropriately designed study" to establish bioequivalence. *See* 21 C.F.R. § 314.3. FDA's conclusion that MSN's bioequivalence study was "appropriately designed" plainly "runs counter to the evidence before the agency" (*Chiayu Chang v. USCIS*, 289 F. Supp. 3d 177, 186 (D.D.C. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)))—there were no female or non-Asian subjects in MSN's bioequivalence study—and it was therefore not "appropriately designed."

    **b.**  FDA's decision to nonetheless approve MSN's ANDA was thus unlawful.

---

[8]    The Court may consider agency guidance without the need for its inclusion in the administrative record. *Stand Up for Cal.! v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289, 295 (D.D.C. 2018). Indeed, after Vanda asked FDA to supplement the appendix with the guidance materials, FDA proposed that the materials be placed in a supplemental appendix for the Court's convenience.

To start, because FDA included its demographic-representation guidelines in longstanding policies, its "unexplained inconsistency in agency policy" by approving MSN's ANDA without representation of the sexes or racially diverse subjects is "arbitrary and capricious." *Encino Motorcars*, 579 U.S. at 221-222. Indeed, it is worse—beyond changing policy, FDA was not even "*aware*[] that it [wa]s changing position." *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017). FDA inexplicably affirmed that "yes" the "demographics profile of subjects completing the bioequivalence study [was] in agreement with the current drug product recommendation" and concluded that "[t]he study design is adequate." AR8518, 8487, 8501.

| Is the demographics profile of subjects completing the bioequivalence study in agreement with the current drug product recommendation? If no, please comment. | ☒ Yes   ☐ No |
| --- | --- |

AR8518. But FDA provided no further comment or explanation for the conclusion nor any recognition whatsoever that MSN's bioequivalence study did not comply with its requirements. *See id.* This "inaccurate" justification likewise is arbitrary and capricious. *Envtl. Def. Fund*, 922 F.3d at 454.

FDA provided *no* explanation as to why it concluded that MSN's study was appropriately designed notwithstanding its absence of demographic diversity—and there is none. A "court must be sure that the agency has 'articulate[d] a satisfactory explanation for its action.'" *Chiayu Chang*, 289 F. Supp. 3d at 182 (quoting *U.S. Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (alteration in original)). Indeed, courts "should … insist on a 'reasonable explanation of the specific analysis and evidence upon which the Agency relied.'" *Citizens for Resp. & Ethics in Washington v. FEC*, 209 F. Supp. 3d 77, 88 (D.D.C. 2016) (Cooper, J.) (quoting *Bluewater Network v. EPA*, 370 F.3d 1, 21 (D.C. Cir. 2004)). Ultimately, an agency's failure to "fully explain" a decision can only survive review "if the agency's path may reasonably be discerned." *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 35 (D.D.C. 2019) (Cooper, J.). Here, FDA provided *no* path for its reasoning—much less a reasonable one.

But even if FDA *had* acknowledged the inconsistency between its action on MSN's ANDA and its bioequivalence standards, and *attempted* to provide an explanation as to why MSN's study was sufficient to show bioequivalence to Hetlioz® (and again, it has not), FDA's action here would still fall short of providing a plausible, much less "satisfactory," explanation for the disregard of longstanding agency policy. *See Chiayu Chang*, 289 F. Supp. 3d at 182. As explained, FDA guidance has long aligned with the well-settled knowledge that physical, metabolic, and hormonal differences that exist between males and females and between individuals of different backgrounds that can affect the pharmacokinetic profile of a drug—including the rate and extent of absorption of the drug. *Supra* at 5-8. As a result, a showing of bioequivalence in one sex or subpopulation is not sufficient to establish bioequivalence in another or in the population as a whole. *See id.* And the consequences of implying bioequivalence in one population based on bioequivalence in a different population can be severe: what may be *effective* for some can be *toxic* for others.

These considerations are acute with respect to tasimelteon. Vanda's Bioavailability Study indicated that tasimelteon is extensively metabolized (AR595), which logically could produce greater race- and sex-based disparities. Moreover, Vanda's own study discovered that young females experienced 20% to 30% greater exposure to tasimelteon than young males. AR596 (Hetlioz® Label). Even if FDA had attempted to explain the inconsistent application of its guidance on bioequivalence studies when approving MSN's ANDA (it did not), there would be no "good reasons for [a] new policy" that could sustain such a decision. *Am. Wild Horse*, 873 F.3d at 928.

### 2. *FDA failed to explain lack of blinding in MSN's bioequivalence study.*

FDA further failed to provide an explanation as to why MSN's open-label study, as opposed to the kind of double-blind study that it recommends, was adequate to satisfy its study design standards. *See* AR8483-8487. As FDA and others in the industry have recognized, using an open-label study can introduce bias. *See* 2001 FDA Guidance, *supra*, at 4. Blinding studies is thus critical to "minimiz[ing] the potential biases resulting from differences in management, treatment, or

assessment of patients, or interpretation of results." *Id.*; *see also* AR697-698. Although MSN's failure to blind its study risked introducing bias from both the investigators and the enrolled subjects, calling into question the veracity of MSN's bioequivalence study, FDA provided no explanation for its determination the study was appropriately designed. *See generally* AR8466-8529. As such, its approval of MSN's ANDA for generic tasimelteon was arbitrary and capricious on this separate ground, too. *E.g.*, *St. Lawrence Seaway Pilots Ass'n*, 357 F. Supp. 3d at 35.

### B. FDA failed to consider critical pharmacokinetic and dissolution testing discrepancies that undermine MSN's bioequivalence study results.

FDA's approval of MSN's ANDA was arbitrary and capricious for the independent reason that the agency "entirely failed to consider … important aspect[s] of the problem" (*Nat'l Lifeline*, 921 F.3d at 1110): MSN's study test *results* that call into question the veracity of the data itself. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."). FDA's failure to consider these important issues renders its action unlawful.

The premise of requiring a showing of bioequivalence is that it affords some confidence that the proposed generic drug acts equivalently in the human body "to the *listed drug*." *See* 21 U.S.C. § 355(j)(2)(A)(iv), (4)(F) (emphasis added). Accordingly, foundational considerations in assessing a bioequivalence study include (1) whether the study in fact used the reference listed product as the comparator, and (2) whether the study sufficiently controlled for systematic error in sampling and measuring data for the reference listed drug. Here, evidence before FDA indicated that MSN's bioequivalence study either did not use Hetlioz® as the listed drug at all, or that it did not sufficiently control for systematic errors in the study, rendering its conclusions erroneous.

***Pharmacokinetic data.*** As explained, a properly conducted bioequivalence study generates pharmacokinetic data for the proposed generic product, as well as the already-approved, listed product because the study must compare such data between the generic product and the reference listed drug. *Supra* at 6; *see also* 2003 FDA Guidance, *supra*, at 2-3; 2021 FDA BE Guidance,

*supra*, at 2. The pharmacokinetic data for the listed drug collected during a bioequivalence study should therefore be the same or similar to existing pharmacokinetic data for the already-approved, reference listed drug—assuming the study actually uses the listed product as the reference and uses test subjects representative of the population. *See also* Ex. 3, Taft Decl. ¶¶ 44, 49.

In this case, FDA did not only have pharmacokinetic endpoint data for Hetlioz® from Vanda's original NDA before it, it also had pharmacokinetic endpoint data from another manufacturer's separate bioequivalence study submitted to support its ANDA before it. *See* Ex. 2, Apotex BE Review 1. And, as required in that ANDA, Apotex submitted a study on which FDA based its conclusion that Apotex's generic product is bioequivalent to Hetlioz®. *See id.* at 9-37. In its testing, MSN purported to test the *very same lot* of Hetlioz® (Lot No. 3140788) as Apotex did in testing for its generic product. AR8479, 8484; Ex. 2, Apotex BE Review 23-24.

Vanda's original NDA, Apotex's ANDA, and MSN's ANDA all purported to measure the pharmacokinetic endpoint data of 20mg tablets of orally administered Hetlioz®. Thus, the results of those pharmacokinetic measures should be the same or similar. Instead, the data show "the pharmacokinetic results of Hetlioz® testing in MSN's BE study are more than *double* the mean values obtained from Vanda's Phase I clinical studies and *roughly double* the mean values from Apotex's BE Study." Ex. 3, Taft Decl. ¶¶ 77-78 (*comparing* AR8508-8511 (MSN BE Review), *with* Ex. 1, Hetlioz® Clin. Pharm. & Biopharm. Review(s) 16–17, *with* Ex. 2, Apotex BE Review 17); *id.* ¶¶ 52-111 (detailing these "significant" discrepancies and why they cannot be explained by random error). The disparity is even more significant when MSN's exclusion of females from its bioequivalence study is taken into account: As FDA noted in its review of Vanda's Hetlioz® NDA, female subjects taking Hetlioz® had higher $C_{max}$ and $AUC_{\infty}$ estimate means than male subjects. *See* AR596 (Hetlioz® Label); Ex. 1, Hetlioz® Clin. Pharm. & Biopharm. Review(s) 20. Thus, had MSN included females in its BE study, its means would have been *even higher*.

These obvious discrepancies call into serious question whether MSN's study actually used

Vanda's Hetlioz® as the reference listed product. *See* Ex. 3, Taft Decl. ¶¶ 18, 77-80, 112-115. If MSN's bioequivalence study did actually use Hetlioz®, the results reflect *either* that there is a true difference in the absorption of the drug in the sampled populations, *or* that MSN's BE Study was conducted in a significantly flawed manner—or both. *See id.* ¶¶ 69, 76, 77, 79-80, 112-114. In any case, the study would be insufficient to show bioequivalence to Hetlioz®. *See id.*

      **Dissolution data.** While those discrepancies in MSN's bioequivalence data are alone enough to undermine the reliability of MSN's study, that is especially true when taken together with the separate but similar discrepancies in MSN's *dissolution* data. MSN's dissolution results should be the same or similar. Here again, though, MSN's dissolution profile of Hetlioz® Lot 3140788 differs dramatically from Apotex's. While Apotex's data shows Hetlioz® reaching 100% release in 15 minutes,[9] MSN's data *never* shows Hetlioz® reaching 100% release—even after 30 minutes. *Compare* Ex. 2, Apotex BE Review 24, *with* AR8508-8511.

      These discrepancies in MSN's data should have precluded approval, particularly absent a satisfactory explanation as to why they do not undermine a bioequivalence finding. A generic drug cannot, by definition, satisfy the obligation to show that "the rate and extent of absorption of the drug" are not "significant[ly] differen[t] from the rate and extent of absorption of the listed drug" (21 U.S.C. § 355(j)(8)(B)) when the ANDA applicant's results are so widely divergent from the FDA's own analysis of the rate and extent of absorption of the listed drug *and* another ANDA applicant's results for the same lot of the listed drug.

      These discrepancies are further magnified by the "period effect" observed in MSN's study. *See supra* at 14; AR217-218. Its study showed differences in bioequivalence results between at least one period and another that were significant enough to likely not be random error—and yet,

---

[9]    Note that Apotex's chart labels its dissolution "collection time" in "hours." *See* Ex. 2, Apotex Bioequivalence Review 23. We believe this to be a typographical error as it would be highly unusual to conduct dissolution testing other than in minutes, and the "proposed specification" is designated in an increment of "20 minutes." *Id.*

according to MSN, the only explanation is that "psychological status" across subjects in a period caused these differences in the rate and extent of absorption.

Nevertheless, FDA entirely failed to consider, much less justify, these discrepancies that substantially undercut the reliability of the sole study that served as the basis for FDA's approval of the generic drug. The only possible explanations for such a failure would be either that (1) FDA neglected to consider the discrepancies (or, indeed, the validity of MSN's data at all), or (2) FDA disregarded this evidence that contradicts its conclusion that MSN submitted information sufficient to show that its product is bioequivalent to Hetlioz®. Neither would satisfy the agency's obligation to engage in reasoned decision-making. *See Nat'l Lifeline*, 921 F.3d at 1110; *Genuine Parts Co.*, 890 F.3d at 312; *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 24 (D.D.C. 2013).

*    *    *

If FDA attempts to claim that it did not consider the known dissolution and pharmacokinetic profile of Hetlioz® from either Vanda's sNDA or from another ANDA under review at the same time, its failure to consider this information would itself be arbitrary and capricious. An agency is obligated to consider evidence at its disposal that bears on the problem before it. "[T]he agency *must* examine the relevant data." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. And "an agency cannot ignore evidence that undercuts its judgment." *Genuine Parts Co.*, 890 F.3d at 312; *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 199 (D.D.C. 2005) (an "agency may not … skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question").

While an agency need not "comb all [its] files for potentially relevant data," it acts arbitrarily and capriciously when it "negligent[ly] fail[s] to discover" documents that bear directly on the critical issue, contained in obviously relevant agency files. *Kent Cnty., DE Levy Ct. v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992) (supplementing the record with documents that "relate[d] to the position of the agency's own experts on the question central to [the] case" that "it would have

23

found" had the agency "simply checked the files" most relevant to the issue). This is such a case. FDA did not need to comb through voluminous records to discover the evidence at issue; it need only have looked to the data in its possession—indeed, its *own* written analysis of that data— describing the dissolution and pharmacokinetic testing results obtained independently by both Vanda and Apotex *for the reference listed drug*, including testing of the same drug lot.[10]

If FDA failed to examine this highly relevant data in its possession—evidence of precisely the dissolution and pharmacokinetic profile for Hetlioz® and even the very same lot of Hetlioz®— that action would be arbitrary and capricious. FDA can thus not attempt to sidestep this highly probative evidence by claiming it did not consider the material. *See Kent Cnty.*, 963 F.2d at 396 ("To deny [the] relevance [of documents relating to the position of the agency's own experts on the question central to the case] would be inconsistent with rational decisionmaking by an administrative agency."). Particularly in light of the public revelations of massive bioequivalence fraud by generic drug manufacturers—including the very laboratory MSN used (*see Bottle of Lies*, *supra*)—FDA must assess whether the data stated might be fraudulent. For there is no doubt that "the use of invalid data is, in itself, an arbitrary and capricious action." *See City of Stoughton v. EPA*, 858 F.2d 747, 750 (D.C. Cir. 1988). This simple comparison to other data in FDA's possession would have revealed the serious discrepancies.

### C.    FDA failed to explain how MSN's study was "adequate" despite the objectionable conditions at its study site.

Additionally, FDA failed to explain why MSN's bioequivalence study was adequate notwithstanding the discovery of serious problems with the study conditions. Under the FDCA, FDA may not approve an ANDA if the "methods used in, or the facilities and controls used for" manufacturing, processing, packing, and testing of the drug are "inadequate to assure and preserve [the

---

[10]   This is especially true when Vanda has discovered that FDA checked Vanda's application in other situations in order to assist ANDA applicants in preparing their applications. *See Vanda Pharms. Inc. v. United States*, 169 Fed. Cl. 196, 203 (2024).

drug's] identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A); *see also* FDA Compliance Program 7346.832 ch. 46, at 8 (2022), perma.cc/LR5U-SFGD. As such, FDA inspectors must ensure that the data submitted with the ANDA is accurate and complete—including verifying the integrity of the bioequivalence study. FDA Compliance Program 7348.004 ch. 48, at 7 (2018), perma.cc/RA49-798V (explaining that the objectives of the bioequivalence bioresearch monitoring program include "ensur[ing] the quality, integrity and validity of clinical, analytical, and statistical data from BA/BE studies" and "ensur[ing] compliance with applicable FDA regulations and … identify[ing] significant deviations").

Here, FDA's inspection of MSN's analytical site revealed "[s]ignificant objectionable conditions … that impacted the reliability of a portion of the audited studies." AR8480-8481; AR8245-8249. Although OSIS reviewers confirmed that blood hemoglobin concentrations were not being accurately measured, impacting the reliability of data at the facility, FDA nevertheless concluded that "the inspectional findings were isolated in nature" and were "not likely to have an impact on the outcomes of the current ANDA." AR8480-8482.

FDA's limited explanation as to why MSN's study should be accepted despite these "objectionable" conditions is inadequate to satisfy its obligation to explain its decision. *See Citizens for Resp. & Ethics in Washington*, 209 F. Supp. 3d at 88 (requiring a "reasonable explanation of the *specific analysis* and evidence upon which the [a]gency relied" (emphasis added)). At minimum, in the face of the documented problems, FDA should have explained why the "facilities and controls" used for testing MSN's generic drug were nonetheless adequate to "assure and preserve [the drug's] identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A). That failure alone is enough to show that FDA's acceptance of the bioequivalence study was arbitrary and capricious. But, particularly when taken together with the substantial testing data discrepancies and the study-design flaws, FDA has failed to satisfy its obligation under the APA with an explanation that it was "not likely" that the objectionable conditions impacted MSN's bioequivalence study.

*    *    *

An agency decision is contrary to law if the decision is "inconsistent with the statutory mandate or … frustrate[s] the policy that Congress sought to implement." *Illinois Commerce Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984). Moreover, when an agency violates its own regulations, it acts contrary to law. *Nat'l Env'tl Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1011 (D.C. Cir. 2014). Here, the data presented by MSN is "insufficient to show that the drug is bioequivalent to the listed drug referred to in the application." 21 U.S.C. § 355(j)(4)(F). And there was no "appropriately designed study," as the regulations require. 21 C.F.R. §§ 314.3, 320.23(b)(1). For these reasons, there was not—as a matter of law—"sufficient" evidence to "show" that "the new drug is bioequivalent to the listed drug." 21 U.S.C. § 355(j)(2)(A)(iv), (4)(F). FDA's approval of the ANDA must therefore be set aside. *See* 5 U.S.C. § 706(2)(A).

## II.    FDA'S APPROVAL OF MSN'S ANDA WAS CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORIZATION.

Because the official who signed the ANDA was improper under both the Appointments Clause and FDA procedure, FDA's action also must be set aside as contrary to governing law and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C). FDA purports to obviate these violations via a ratification that was executed the same day that its motion to dismiss in this matter was due to the Court—but that supposed cure plainly fails under the precedents of the D.C. Circuit.

### A.    FDA's approval of MSN's ANDA violated the Appointments Clause.

The Appointments Clause of the U.S. Constitution protects democracy from bureaucratic encroachment: "[T]housands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021). Indeed, the "Framers understood … that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Freytag v. Commissioner*, 501 U.S. 868, 884

(1991). It further serves as "a bulwark against one branch aggrandizing its power at the expense of another." *Ryder v. United States*, 515 U.S. 177, 182 (1995).

Because approval of a new drug in the United States is a consequential decision, the official making the decision must be directly accountable to our democracy. The decision to approve a generic drug product undeniably imposes legal consequences for regulated parties. It affects the rights of a drug applicant because the decision determines whether the applicant may market their drug to the public. *See generally* 21 U.S.C. §§ 331, 333, 355. And it further affects the public and other drug manufacturers because the decision determines whether a particular product will be available for distribution in the U.S. market. *See id.* §§ 331(d), 355(a).

Because an individual who approves an ANDA may render a final decision on behalf of the government, without any need for review by a superior official, they must be *principal* officers for purposes of the Appointments Clause.[11] Accordingly, any such signatory authority must be a properly appointed principal officer of the United States. *See Buckley v. Valeo*, 424 U.S. 1, 132-133 (1976) (per curiam); *Lucia v. SEC*, 585 U.S. 237, 247 (2018); *Arthrex*, 594 U.S. at 6-16.

For its part, FDA does not deny that ANDA No. 211654 was not the product of a reasoned decision by a validly-appointed official. Nor could it. FDA's approval of MSN's ANDA bore the name of Edward M. Sherwood, the Director of the Office of Regulatory Operations within the Office of Generic Drugs, and the actual signature was by John Ibrahim, Pharm.D. AR8623-8624. Neither was appointed by "the President alone," a court, or a head of department. U.S. Const. art. II, § 2, cl. 2; *Lucia*, 585 U.S. at 244; *see also* Compl. ¶ 104.

Rather than contest these violations, FDA sought to obviate its constitutional transgressions

---

[11]    The "signatory authority" who acts on an ANDA by definition commits the FDA to a particular course of action. FDA, *Information Requests and Discipline Review Letters under GDUFA* 3 n.10 (Oct. 2022), perma.cc/C2MR-CJTN (GDUFA Guidance). FDA policy plainly states as much: The "signatory authority" who acts on an ANDA has "the power to commit the Agency to an action on a particular ANDA." *Id.*

via ratification. *See* AR8625-8629.[12] The agency offers a memorandum signed by Dr. Iilun C. Murphy (Director of OGD within CDER) at 4:09 pm the day FDA's motion to dismiss was due, stating that she "affirm[ed] and ratif[ied] the execution of the approval of ANDA 211654 … as of the approval date on January 12, 2023," a ratification she made "based on [her] understanding of the regulatory and scientific standards and [her] general knowledge of the action." AR8628. FDA further relies on a document in which Secretary of Health and Human Services Xavier Becerra, also on the day FDA's motion was due, purported to "ratif[y] the prior appointment of, and pro-spectively appoint[] [Dr.] Murphy" to the position of "Super Office Director" of OGD (AR8627) in a custom, for-litigation "appointment" that includes no provisions reflecting the Secretary's re-sponsibility for Dr. Murphy's actions or to whom she is accountable.

**B.    FDA's attempted ratification plainly fails.**

But FDA's ratification theory fails multiple times over: Dr. Murphy is (1) not a validly appointed "inferior officer," (2) she was not exercising duties within the permissible scope of an "inferior officer," and even if she was, (3) the ratification in this case does not cure the violation (*see Moose Jooce v. FDA*, 2020 WL 680143, at *4 (D.D.C. Feb. 11, 2020) (Cooper, J.), *aff'd*, 981 F.3d 26 (D.C. Cir. 2020)).

*1.    Dr. Murphy is not a properly appointed inferior officer.*

As explained, "inferior officers" may be appointed by the President with Senate confirma-tion, or "Congress … *may authorize* the President alone, a court, or a department head to appoint an inferior officer." *Lucia*, 585 U.S. at 244 n.3.

Here, Dr. Murphy was putatively appointed by a head of department; thus, in order to be effective, Congress must have authorized the department head to appoint the officer in question. *See Lucia*, 585 U.S. at 244 n3. Indeed, "[q]ualifying as an inferior officer" based on the proper

---

[12]    FDA added ratification-related materials to the administrative record on April 17, more than three weeks after the deadline. 1/26/2024 Minute Order.

*source* of appointment "is not enough to satisfy the Appointments Clause." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 618 (D.D.C. 2018). Rather, "Congress must also 'by Law vest' the authority to appoint the inferior officer in a 'Head of Department.'" *Id.* (citations omitted). In other words, as the Supreme Court explained long ago, the Appointments Clause makes clear that "[t]he head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress." *United States v. Perkins*, 116 U.S. 483, 485 (1886).

But Congress never authorized Dr. Murphy's appointment mechanism. No statute—neither a specific nor a general one—vests appointment authority for the OGD Director in the head of the Department of Health and Human Services. And the lack of any statute vesting such authority stands in stark contrast to other components of that Department. For the Social Security Administration, the Secretary is empowered to "appoint and fix the compensation of such officers and employees … as may be necessary for carrying out the functions of the Secretary under [chapter 7 of Title 42]." 42 U.S.C. § 913 (emphasis added).[13] No such authority exists under the statutes empowering the Secretary to appoint officers to carry out the duties of the FDA. Dr. Murphy thus does not occupy a position whose appointment Congress has directly "vest[ed] … in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

No doubt recognizing this constitutional requirement, FDA identified a single statute (MTD Br., ECF No. 9, at 40)—21 U.S.C. § 379d-3a. That provision provides that the "Secretary may … appoint outstanding and qualified candidates to scientific, technical, or professional positions, including cross-cutting operational positions, that support the development, review, and

---

[13]  *See also, e.g.*, 7 U.S.C. § 610(a) (the Agriculture Secretary "may appoint such officers and employees, … and such experts, as are necessary to execute the functions vested in him"); 20 U.S.C. § 3461(a) (the Education Secretary "is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department"); 49 U.S.C. § 323(a) (the Transportation Secretary "may appoint and fix the pay of officers and employees of the Department of Transportation").

regulation of medical products and the regulation of food and cosmetics." *Id.*

To start with, nothing in § 379d-3a authorizes the Secretary to appoint *officers* at the Office of Generic Drugs. In direct contrast to other statutes, section 379d-3a facially does not authorize the Secretary to appoint officers—and FDA fails to explain how it possibly could.

In fact, the statute makes clear that it does *not* empower the appointment of officers. Section 379d-3a specifies that "[s]uch positions *shall be within the competitive service*." *Id.* (emphasis added). The competitive service is in turn defined to *exclude* principal officers as well as "positions in the Senior Executive Service" (SES). 5 U.S.C. § 2102(a). This distinction matters because the OGD Director qualifies as an SES position under the Civil Service Reform Act's definition: "classified above GS-15," and the official "directs the work of an organizational unit," "is held accountable for the success of one or more specific programs or projects," "monitors progress toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals," "supervises the work of employees other than personal assistants," or "exercises important policy-making, policy-determining, or other executive functions." 5 U.S.C. § 3132(a)(2); *see also SES Positions That Were Career Reserved During CY 2012*, 78 Fed. Reg. 28,296, 28,343 (May 14, 2013) (listing "Director, Office of Generic Drugs" as an "SES position[] that w[as] career reserved"); *SES Positions That Were Career Reserved During CY 2016*, 82 Fed. Reg. 55,158, 55,220 (Nov. 20, 2017) (same).

Because Congress intended SES positions to be those officials who exercise significant authority, constitutional "Officers" must be part of the SES—not the competitive service. Indeed, members of the SES are excluded from many of the strict merit-based protections associated with competitive service and "may be reassigned or reviewed by agency heads." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506-507 (2010). The Supreme Court has suggested that the absence of these "significant … protections" for SES members may be key in determining

whether the official has status as an inferior officer. *Id.*[14] Consistent with that understanding, Congress's use of the phrase "*support* the … review" in 21 U.S.C. § 379d-3a(a), rather than a different term like approve, bolsters the conclusion that employees appointed under the provision are not themselves authorized to take binding acts on behalf of the United States.

FDA cannot overcome the plain meaning of the statute. FDA insists that reading the statute "as a whole" shows that it confers authority to appoint inferior officers. MTD Reply, ECF No. 9, at 20-21 (citing *Al Bahlul v. United States*, 967 F.3d 858 (D.C. Cir. 2020)). But FDA identifies nothing in the statute "as a whole" to support its view that Congress vested officer appointment authority through § 379d-3a(a). For starters, use of the word "appoint" does not suffice—employees are placed into federal service through "appointment." *See* 5 U.S.C. § 2105 (defining "employee" as someone "appointed in the civil service").

Nor does the remainder of the statute suggest the power to appoint officers either. In *Al Bahlul v. United States*, 967 F.3d 858, 875 (D.C. Cir. 2020), Congress created a new office, endowed the office with the powers of an inferior officer and, in the same breath, conferred the authority to designate someone to serve in the office. *Id.* Section 379d-3a has no such hallmarks. Section 379d-3a appointees can only "*support* the development, review, and regulation of medical products." That does not create an office or even functions that must necessarily be performed by an "Officer." Instead, FDA has invented that power—a direct affront to Congress's vesting authority.

Moreover, Section 379d-3a was a Congressional response to FDA's poor performance in

---

[14]    FDA insisted that Congress's designation of these individuals for competitive service rather than SES is a "red herring" and that its relevance is "pure *ipse dixit*" because Officers do not have to be in SES. MTD Reply, ECF No. 19, at 21. Not so. The disputed question is not whether the OGD Director is an Officer under the Appointments Clause—FDA now concedes she is—but instead whether Congress intended through Section 379d-3a to authorize appointment of Officers. By 2016, Congress was undoubtedly aware of modern Supreme Court precedent on the Appointments Clause, and its authorization to appoint competitive-service roles to "support" the review of drugs proves that it was *not* authorizing the appointment of those who *approve* new drugs.

recruiting and retaining medical product staff due to large pay disparities relative to private industry. *See* Gov't Accountability Office, *Agency-Wide Workforce Planning Needed to Ensure Medical Product Staff Meet Current and Future Needs* at highlights (Jan. 2022), perma.cc/WG8Z-CE9T. Those concerns do not logically extend to individuals recruited to serve as Officers of the United States—the Executive Branch is run by numerous individuals willing to accept the opportunity cost to serve in a high-ranking position in the government. FDA's reading of the statute "as a whole"—that Congress intended "significant authority of the United States" to be exercised by individuals who can name their price and retain all the protections of the competitive service—proves the error of FDA's reading. The very point of the Appointments Clause is that those who exercise the United States' authority must be "accountable to political forces and the will of the people." *Freytag*, 501 U.S. at 884.

In all, Congress did not provide in § 379d-3a(a) congressional authorization for the Secretary to appoint inferior officers, and FDA's efforts to find such authority there is wrong.[15]

It speaks volumes that the Secretary's document does not mention Section 379d-3a(a) at all; he instead points to certain Reorganization Plans. AR8627. But nowhere do they provide authority to *appoint* officers, and certainly not officers at FDA. Two provisions arguably authorize the Secretary to *delegate* his "functions" to existing officers; it does not authorize the Secretary to *appoint* officers. *See* Reorganization Plan No. 1 of 1953, 67 Stat. 631, § 6 ("The Secretary may from time to time make such provisions as the Secretary deems appropriate authorizing the performance of any of the functions of the Secretary by any other officer, or by any agency or employee, of the Department."); Reorganization Plan No. 3 of 1966, 80 Stat. 1610, § 2 (materially similar). And Section 1 of the Reorganization Plan No. 3 of 1966 says exactly nothing about the *appointment* of officers. By contrast, other Reorganization Plans—though not applicable to

---

[15] Also consistent with that understanding, after *Lucia*, the President removed all ALJs from the competitive service. *See* Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018).

HHS—*do* authorize appointment of officers. Take, for example, Reorganization Plan No. 1 of 1939; it authorizes the National Resources Planning Board to both "appoint necessary officers" and, *separately*, to "delegate to such officers authority." § 4(c), 53 Stat. 1423.[16] Appointment and delegation of authority are two separate things. The Secretary thus lacked authority to appoint Dr. Murphy as an inferior officer, and there thus could be no ratification.

### 2.    *Dr. Murphy's exercise of power exceeds that of an inferior officer's.*

Moreover, even if Dr. Murphy were a properly appointed inferior officer, she was nevertheless acting outside of the "permissible scope of [her] duties under [the Appointments] Clause" because "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch." *Arthrex*, 594 U.S. at 23.[17] In *Arthrex*, the Court was clear that, where an official has "the power to render a final decision on behalf of the United States" without review "by their nominal superior or any other principal officer in the Executive Branch," the individual must be a *principal* officer. *Id.* at 14. Dr. Murphy has such power. She holds "signatory authority," which FDA defines as the power to "commit the Agency to an action on a particular ANDA." GDUFA Guidance, *supra*, at 3 n.10. Because Dr. Murphy was not validly appointed as a *principal* officer, she lacks the requisite appointment to exercise such power.

No doubt cognizant of this problem, FDA gestures toward a staff manual stating that the OGD director is delegated authority to approve an ANDA "only by virtue of a delegation by the

---

[16]    *See also* Reorg. Plan No. 1 of 1939, § 402(c), 53 Stat. 1423 (the Federal Loan Administrator "may appoint such officers and employees … ."); Reorganization Plan No. 3 of 1946, 60 Stat. 1097, § 403 (providing for "a Director of the Bureau of Land Management, who shall be appointed by the Secretary of the Interior … and who shall perform such duties as the Secretary of the Interior shall designate").

[17]    Under *Arthrex*'s reasoning, there are essentially two ways to conceptualize the violation: on one hand, the individual may be a "principal officer[] who [was] not appointed in the manner required by the Appointments Clause." 594 U.S. at 23. On the other, they may be an "inferior officer[] exceeding the permissible scope of [her] duties under that Clause." *Id.* But "both formulations describe the same constitutional violation: Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch" in the relevant proceeding. *Id.*

[FDA] Commissioner," and that the terms of the delegation "make clear that the Commissioner retains the power to supervise and direct his delegate's work" (MTD Br. 39 (citing *FDA Staff Manual Guide* § 1410.104(1)(D)(1)(a) (effective June 12, 2012), perma.cc/3RGH-USP2)). But the mere fact that the Commissioner could step in to approve any particular application does not—as FDA claims (MTD Br. 39)—suffice. Indeed, as the Court made clear in *Arthrex*, the critical question for purposes of the Appointments Clause is whether the decisionmaking in question is subject to *further review after* the inferior officer's decision. 594 U.S. at 23.

Realizing this fatal defect, for the first time in a reply brief (MTD Reply 22), FDA identified a regulation through which the Commissioner "may at any time reconsider a matter, on the Commissioner's own initiative." 21 C.F.R. § 10.33(a). But this is not the "supervision" the Appointments Clause demands. As the plurality explained in *Arthrex*, "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch." 594 U.S. at 23. Where an individual "ha[s] the 'power to render a final decision on behalf of the United States' without any such review by their nominal superior or any other principal officer in the Executive Branch," that is "significant." *Id.* at 14.

That is this case: the OGD Director can render a final decision on behalf of the United States, and there is no mechanism for direct review of that final decision that renders the decision in any way attributable to the Commissioner. Accountability is the touchstone of the Appointments Clause—which is why the Supreme Court has long rejected attempts to substitute superficial control mechanisms like those here. *Magwire v. Tyler*, 66 U.S. (1 Black) 195, 202 (1861) ("Of necessity, [the Commissioner] must have power to adjudge the question of accuracy *preliminary* to the issue of a [land] patent." (emphasis added)). Indeed, in *Arthrex*, the Court rejected the Government's argument that because the Director *could* "intervene in the rehearing process," the process was sufficiently under his control. 594 U.S. at 15-16. While it was true that the Director could "influence the course" of the proceedings at issue by determining the composition of the panels,

the Court held "[t]hat is not the solution. It is the problem." *Id.* at 16. That sort of hypothetical, general, optional review creates "a roadmap for" an officer to "evade a statutory prohibition on review without having him take responsibility for the ultimate decision." *Id.* That is why the Supreme Court's solution was to provide for Director-level review of all PTAB decisions, and to allow the director to "issue decisions himself on behalf of the Board." *Id.* at 25.

The same is true here. Although at some later point, the Commissioner on his own "initiative" "may" "reconsider" that earlier final decision, no one would understand the existence of such a general authority to render the Commissioner meaningfully responsible for every single decision that the agency makes. Indeed, *all* agencies possess "inherent authority" to reconsider their decisions. *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *accord Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008). In FDA's telling, this inherent authority should suffice to render all decisions attributable to the agency head such that no agency should ever have an appointments clause challenge. This is obviously not what any court has held. Instead, FDA sets up the very scheme abhorrent to the Appointments Clause: "reliev[ing] [the Commissioner] of responsibility for the final decisions rendered by [the OGD Director] purportedly under his charge." *Arthrex*, 594 U.S. at 15. This is not a power of "review"—it is a general power of selective undoing of already final decisions. That is not meaningful supervision. Moreover, even the power to permit a drug into the market just for the amount of time it takes for the Commissioner to "reconsider" such a decision is an exercise of "significant authority"—and that decision is not subject to *any* supervision.

Because FDA fails to demonstrate that the requisite supervision exists here, Dr. Murphy is not properly exercising authority.

### 3. The ratification was a prejudicial sham.

Even assuming Dr. Murphy *was* a validly appointed inferior officer who *could* exercise authority to approve the ANDA within the bounds of the Appointments Clause, the ratification

was no more than a prejudicial sham—rendering it ineffective under Circuit precedent.

**a.** As a starting point, the ratification doctrine does not apply because the signatory authority over MSN's ANDA was at all times presiding unconstitutionally. A signatory authority is the agency official "with the power to commit the Agency to an action on a particular ANDA." GDUFA Guidance, *supra*, at 3 n.10. This power is not limited only to the final approval or rejection but also embraces innumerable intermediate steps along the way to ANDA approval, including interim steps like complete response letters identifying deficiencies and proposing corrections. *Id.* at 3 & n.11). As in *Lucia*, where the Supreme Court held that the Appointments Clause required a complete do-over before a properly appointed official without the involvement of the tainted prior adjudicator (585 U.S. at 251), the same follows here. The entire process that resulted in permitting a competitor into the market with a dangerous generic knockoff was not supervised by a properly appointed official—not the major interim decisions and not the final approval. The "appropriate" remedy is to rescind MSN's ANDA approval for a properly appointed official supervising a fresh team of reviewers to conduct the proceeding anew. FDA has no response to our point. Instead, it half-heartedly asserted that Vanda already received the "new" review by a properly appointed official. *See* MTD Reply 22. But the AR includes *no* evidence of any meaningful review. *See* AR8625-8629. Instead, the operative ratification is a single-day rubber stamp of a final decision. This is no substitute for a properly appointed official supervising the full review and approving each of the major intermediate steps taken along the way toward final approval. *See Lucia*, 585 U.S. 251.[18] Dr. Murphy did not purport to redo each interim step.

**b.** Even assuming the ratification doctrine applied, ratification of a prior decision can only remedy an Appointments Clause violation if "a properly appointed official has the power to

---

[18]    Dr. Murphy apparently attempted to ratify the decision four days earlier, on January 8, under a ratified and "prospective" appointment as Deputy Director, Clinical Regulatory Affairs signed in July 2023 (AR8625-8626)—after she was already serving as OGD Director according to FDA's briefing in this Court (MTD Reply 23).

conduct an independent evaluation of the merits *and does so*." *Intercoll. Broad. Sys. v. Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015) (emphasis added) (citing *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996), *Doolin Sec'y Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998)); *see also Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017). Thus, where a plaintiff has evidence "to suggest that the [agency] failed to conduct an independent evaluation of the merits or make a detached and considered judgment" (*Moose Jooce*, 2020 WL 680143, at \*4 (quoting *Wilkes-Barre*, 857 F.3d at 371)) and can show that a genuine reassessment would yield a different result (*Doolin*, 139 F.3d at 212-213), ratification is not an adequate remedy.

Vanda easily shows that Dr. Murphy did not conduct a valid, independent review. *See Moose Jooce*, 2020 WL 680143, at \*4 (citing *Wilkes-Barre*, 857 F.3d at 371). First, if FDA had any evidence that Dr. Murphy had been occupied with reviewing this ANDA, it should have placed it in the AR—but there is none. Second, the timing of the ratifications is highly suspect. FDA's memorandum was signed by Dr. Murphy at 4:09 pm on the day FDA's motion was due and filed five hours later (at 9:02 p.m.). ECF No. 11-1; AR8628. Not only was Dr. Murphy's ratification done in the eleventh hour, her *own appointment* to her role as OGD Director was apparently ratified by Secretary Becerra on the very same day (January 12, 2024)—at some unspecified time. ECF No. 11-2; AR8627. The documents fail to show that Dr. Murphy was in fact cloaked with the Secretary's appointment when she conducted the necessary review to issue a ratification. What is more, the operative January 12 ratification was apparently just a do-over of a January 8 ratification signed when Dr. Murphy had *not* been appointed as OGD Director and instead was operating under a ratified appointment to a subordinate role that does not even have delegated authority to approve an ANDA. *See* AR8626 (January 8 ratification), AR8625 ("prospective" appointment to "Deputy Director, Clinical Regulatory Affairs"); *FDA Staff Manual Guides, Vol. II: Approval of New Drug Applications and Their Supplements* 2 (June 12, 2012), perma.cc/A5Z7-R8YN (limiting approval authority to the "Director" and "Deputy Director" of OGD). It is thus not even clear that Dr.

Murphy conducted any review at all while OGD Director. The only thing clear is that FDA created these records for this litigation.

There is more. Dr. Murphy's ratification is plainly inconsistent with the agency's position expressed in the interim response to the citizen petition. While the ratification states that, within a few hours, Dr. Murphy was able to "affirm and ratify the execution of the approval of ANDA 211654" and that she did so based on an "understanding of the regulatory and scientific standards" and "general knowledge" (AR8628), FDA's interim response to the petition declares that it has been "unable to reach a decision" on whether it should rescind the ANDA because that question "raises complex issues requiring extensive review and analysis." FDA Interim Response to Vanda's Citizen Petition, Docket No. FDA-2023-P-1985 (Nov. 8, 2023).

In other words, FDA asks the Court to find that the purported inferior officer here was appointed to a constitutionally proper role by the Secretary and, cloaked with this authority, conducted a sufficiently "detached and considered" review of the underlying approval decision (*Wilkes-Barre*, 857 F.3d at 371) all within a span of a few hours, even though the agency has been unable to resolve Vanda's citizen petition for nearly a year. The agency's representations tend to show that Dr. Murphy's review was *not* genuine. In fact, Dr. Murphy was plainly aware of the specific reasons why the underlying ANDA approval was wrong—this lawsuit, which she acknowledges, highlights them. AR8628. Yet she ratified the action anyway, with no explanation given. This further confirms that she did not "conduct an independent evaluation of the merits or make a detached and considered judgment." *Moose Jooce*, 2020 WL 680143, at *4.

The prejudice flowing from the defective ratification is clear in view of the plain unlawfulness of the underlying agency action. *See supra* at 16-26. Without explanation, Dr. Murphy says that she ratified the conclusion that MSN's "demographics profile" complied with the current drug product requirements—which require testing in "healthy males and nonpregnant females, general population"—despite that MSN's study was on its face conducted in 44 Asian males. This is proof

positive that her review was not "genuine." And, while FDA insists that Dr. Murphy did not have to consider "new evidence" from Vanda's citizen petition (MTD Reply 23), the defect is clear as day from the ANDA review itself. Even on the existing record, then, Vanda can demonstrate that the ratifying official did not conduct a valid review and that a proper review would lead to a different result. *See Moose Jooce*, 2020 WL 680143, at *4.

### C. FDA's approval of MSN's ANDA violated its own delegation of authority.

#### 1. The individuals who approved MSN's ANDA lacked authorization.

The approval of MSN's ANDA violates FDA's own delegations of authority. The Secretary has purported to delegate authority to the FDA Commissioner, who has purported to redelegate certain "authorities" (including the power to render decisions on ANDA applications) to other officials and, in doing so, prohibited the empowered officials from "further redelegat[ing] these authorities." *FDA Staff Manual Guides, Vol. II, supra*, at 5. Yet, so far as we are aware, FDA never delegated authority to any individual within the Office of Generic Drugs' Office of Regulatory Operations. *See generally id.* Thus, the purported approval of MSN's ANDA—in violation of FDA's own procedures—was unlawful for that independent reason. That is because, under the "*Accardi* doctrine," "agencies can be held accountable to their own codifications of procedures and policies." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 335-341 (D.D.C. 2018).

Moreover, Dr. Murphy apparently ratified the ANDA while she was serving as the "Deputy Director, Clinical Regulatory Affairs" (AR8625), which likewise does not have delegated authority to approve ANDA applications. *See FDA Staff Manual Guides, Vol. II, supra*, at 2 (limiting approval authority to the "Director" and the "Deputy Director" of OGD). Thus, Dr. Murphy did her purported ratification in violation of FDA procedures and then merely rubberstamped it.

#### 2. FDA's attempted ratification does nothing to cure the violation of the agency's own policy.

Vanda is severely prejudiced by this violation for the same reasons it is prejudiced by the ratification itself. In other words, a plainly unlawful ANDA was approved by individuals who

lacked authority to approve the ANDA. That approval was then ratified by an individual who lacked authority to approve the ANDA and then ratified again without explanation within hours of FDA's filing of a motion to dismiss in this case.

## III.    THE COURT SHOULD VACATE FDA'S APPROVAL OF MSN'S ANDA AND DIRECT A RECALL.

In granting summary judgment, the Court should vacate FDA's approval of MSN's ANDA for generic tasimelteon (5 U.S.C. § 706(2)(A)) and direct FDA to initiate a recall. In light of FDA's unlawful approval of MSN's ANDA, MSN's ANDA product is now available to the American public, marketed by MSN's partner, Amneal Pharmaceuticals. *See* FDA, *Drugs@FDA: FDA-Approved Drugs: Products on ANDA 211654* (as of Sept. 14, 2023), perma.cc/Q2H9-3X9G; *Highlights of Prescribing Information, Tasimelteon-Tasimelteon Capsule: Amneal Pharmaceuticals NY LLC*, DailyMed (as of Apr. 21, 2024), perma.cc/N7UL-VN9P. And yet FDA has allowed this despite the very serious discrepancies in MSN's bioequivalence showing.[19]

### A.    Vacatur of FDA's approval of MSN's ANDA is warranted.

Courts vacate unlawful agency action and "remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *United Steel v. MSHA*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). The Court has emphasized that vacatur is the "normal remedy" and "ordinary result" that "follows from the court's determination" that "an administrative agency violate[d] the law." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 50 (D.D.C. 2020).

It is the government's burden to prove that the typical remedy of vacatur is inappropriate. *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 268 (D.D.C. 2015). Such a decision to flout the normal remedy depends on (1) the "seriousness of the [agency's] order's deficiencies" and (2) the likely "disruptive consequences" of vacatur. *Allied–Signal, Inc. v. U.S.*

---

[19]    In fashioning relief, the Court's review is not limited to the administrative record. *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017) ("[A]s the D.C. Circuit has recognized, extra-record evidence may be used 'in cases where relief is at issue.'" (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).

*Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993). FDA must prove that both factors warrant the unusual application of remand without vacatur—and it cannot do so here.

**1.** On the first factor, the agency's order is seriously defective. "[V]acatur is the norm where, as here, the deficiencies that the court has identified are 'substantively fatal.'" *Kiakombua*, 498 F. Supp. 3d at 51-52; *see also Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 378 (D.D.C. 2018) ("Courts regularly decline to exercise this discretion where an agency has committed substantive errors, as opposed to procedural ones."). The defects here are substantively fatal because FDA unlawfully approved MSN's ANDA in violation of the bioequivalence requirements set forth in 21 U.S.C. § 355(j) and 21 C.F.R. §§ 314.3, 320.23(b)(1).

Moreover, the D.C. Circuit has also noted that remand without vacatur is typically only available as an option if "'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so." *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999). Here, it is highly *unlikely* that FDA can lawfully approve MSN's ANDA based on the existing bioequivalence study because the defects described above require a new study. *See* 21 C.F.R. §§ 314.3, 320.23(b)(1). Vacatur is thus warranted.

**2.** Vacating FDA's unlawful approval of MSN's ANDA will not produce meaningful disruption. *Allied-Signal, Inc.*, 988 F.2d at 151. Because MSN's generic tasimelteon is a newly approved drug, patients and providers cannot have developed any reliance interests on the product. *Bayer HealthCare*, 942 F. Supp. 2d at 27 ("While Norbrook has been anticipating and preparing to market Enroflox, it has not proceeded far into the market since its very recent FDA approval."). Separately, Vanda's Hetlioz® remains on the market, as do other generics, and these products are available for consumers. The absence of MSN's product will not disrupt access to medications.

For these reasons, vacatur is warranted here. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1086 (D.C. Cir. 2001) (the "appropriate course is to vacate the action appellant challenges—the FDA's approval of [the generic drug manufacturer]'s ANDA" because it was "convinced that

41

the FDA's order [approving the drug], in this case, was arbitrary and capricious").

**B.      The Court should compel FDA to initiate a recall of MSN's ANDA product.**

Because Vanda has shown that the approval of MSN's ANDA must be vacated, there is no lawful basis upon which MSN can market and distribute its generic tasimelteon product. *See* 21 U.S.C. §§ 331(d), 355(a). The Court should also compel FDA to initiate a recall.

"[T]he APA explicitly contemplates that injunctive relief may be proper when an APA violation is identified." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021); *see also* 5 U.S.C. § 703. And there is no indication in the FDCA that Congress intended to divest federal district courts of their "traditional equitable discretion" in enforcing the statute's provisions. *Amoco Prod'n Co. v. Village of Gambell*, 480 U.S. 531, 544 (1987); *see also United States v. Barr Lab'ys, Inc.*, 812 F. Supp. 458, 489 (D.N.J. 1993) (the "Court may recall any drug product found to be manufactured in violation of the Act that has been released to the public for distribution … consistent with the broad equitable relief powers district courts enjoy").

The equitable relief factors favor relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

On the first and second factors, Vanda will suffer direct economic harm for which there are no adequate remedies at law. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In this case, "any" economic harm caused to Vanda constitutes "irreparable harm" because Vanda "cannot recover money damages against the FDA." *Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010), *aff'd*, 627 F.3d 891 (D.C. Cir. 2010). And these harms are severe and threaten the company: Hetlioz® represented roughly 65% of Vanda's revenue in 2021 and 2022. Compl. ¶ 116. *E.g.*, *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position constitute irreparable harm). And the presence of MSN's generic tasimelteon product in the market will continue to harm Vanda's goodwill and reputation. *E.g.*, *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 104 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019).

The equities and public interest favor the relief, as "the public interest weighs strongly in favor of preventing unsafe drugs from entering the market." *Hill Dermaceuticals, Inc. v. FDA*, 524 F. Supp. 2d 5, 12 (D.D.C. 2007); *see also, e.g.*, *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 166 (D.D.C. 2006) (recognizing that if an ANDA involved a drug that may be "unsafe," the public interest would favor relief preventing the drug from "entering the market"). FDA's "bioequivalence requirement for generic pharmaceutical products is a consumer protection mechanism" designed to ensure "the availability of safe and effective medicines to patients and practitioners." *See* Ex. 4, Roth Decl. ¶ 67. In fact, eight of the ten drugs withdrawn from the market over the years 1997 to 2000 were withdrawn due to risks of adverse effects in females. GAO, *Drug Safety*, *supra*. As described, MSN's generic poses public danger, risking "severe adverse events," particularly for female and non-Asian patients. Ex. 4, Roth Decl.¶ 67; *see also* Ex. 3, Taft Decl. ¶¶ 19, 115. A recall vindicates the FDCA's core purpose of "protect[ing] the health and safety of the public at large." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014); *see also* 21 C.F.R. § 7.45(a)(3) (recalls protect the public health).

There is also "a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *Bayer HealthCare*, 942 F. Supp. 2d at 27. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 123 (D.D.C. 2018).

## CONCLUSION

The Court should grant Vanda's motion for summary judgment and issue an order (1) declaring FDA's approval of MSN's ANDA unlawful, (2) vacating FDA's approval of MSN's ANDA, and (3) compelling FDA to initiate a recall or seizure of MSN's ANDA product.

Dated:  April 22, 2024

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*
*Vanda Pharmaceuticals Inc.*