**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**VANDA PHARMACEUTICALS INC.**,

Plaintiff,

v.

**FOOD AND DRUG ADMINISTRATION**, *et al.*,

Defendants.

</td><td>

Case No. 23-cv-2812 (CRC)

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

Plaintiff Vanda Pharmaceuticals Inc. ("Vanda") developed, manufactures, and sells the sleep-disorder drug tasimelteon under the brand name Hetlioz®. Following the lapse of Vanda's exclusivity period in January 2019, the Food and Drug Administration ("FDA") authorized multiple generic versions of tasimelteon products. It did so most recently in early 2023, approving MSN Pharmaceuticals, Inc.'s ("MSN") generic tasimelteon capsule for sale after determining that it was "bioequivalent" to Hetlioz®.

None too pleased with having yet another competitor in the market, Vanda lodged a "Citizen Petition" with the FDA in May 2023, requesting that the agency vacate MSN's approval for failure "to provide sufficient information to establish bioequivalence." Four months later, while the FDA was still mulling that Citizen Petition, Vanda echoed its grievance in this lawsuit while challenging the FDA's bioequivalence determination as arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. Vanda further claims that the approval of MSN's generic drug violated the Appointments Clause of the Constitution because the FDA employees who approved the application were not "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

The FDA has moved to dismiss Vanda's complaint in full under Federal Rule of Civil Procedure 12(b)(6).  Regarding the APA claims, the FDA raises a trio of threshold defenses that, it says, prevent the Court from considering Vanda's challenge: (1) lack of finality, (2) ripeness, and (3) failure to exhaust mandatory administrative remedies.  As to the Appointments Clause challenge, the FDA maintains that any defect in its initial approval of MSN's generic has since been cured by the ratification of that decision by Dr. Iilun C. Murphy, Director of the Office of Generic Drugs ("OGD") within the FDA's Center for Drug Evaluation and Research ("CDER").

Having considered the briefs and held a hearing on the matter, the Court finds that Vanda's APA challenges are unripe for judicial review because the FDA is currently evaluating the same scientific questions presented in this suit through its assessment of Vanda's pending Citizen Petition, which the agency intends to resolve by early next year.  The Court will, accordingly, dismiss the APA claims without prejudice to renewal should any dispute remain after the FDA's now imminent decision.  By contrast, the Court has lingering concerns about whether Dr. Murphy's ratification cured any Appointments Clause deficiency because it is unclear whether any statute properly authorized her appointment.  Given this uncertainty, as well as the maze of procedural barriers that may prevent the Court from even considering the matter, the Court will allow the FDA one more chance to put the matter to bed for good (should it so choose) before the Court renders a final decision on it.

## I.   Background

### A.  Legal Background

FDA approval is required before any drug can be marketed and sold in the United States. See Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(a).  To obtain approval for a pioneer drug, a manufacturer must submit a new drug application ("NDA") to the FDA in

accordance with the requirements of 21 U.S.C. § 355(b).  An NDA contains the results of extensive scientific testing performed on the drug to ensure that it is safe and effective.  Id. Drugs approved through the NDA process are commonly referred to as "brand-name" drugs.

Prior to 1984, companies that manufactured generic medicines also had to file NDAs supported by full investigative studies.  See Serono Lab'ys, Inc. v. Shalala, 158 F.3d 1313, 1316 (D.C. Cir. 1998).  In 1984, however, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), popularly known as the "Hatch-Waxman Amendments."  The Amendments were designed "to increase competition in the drug industry by facilitating the approval of generic copies of drugs."  Mead Johnson Pharm. Grp. v. Bowen, 838 F.2d 1332, 1333 (D.C. Cir. 1988).  To that end, they eliminated the requirement that generic manufacturers submit full NDAs and instead allowed them to "seek FDA approval by submitting an abbreviated new drug application ('ANDA')."  Serono Lab'ys, 158 F.3d at 1316; see 21 U.S.C. § 355(j).

The ANDA process permits generic-drug companies to "piggyback[] on the original manufacturer's evidence of safety and efficacy," Teva Pharm., USA, Inc. v. Leavitt, 548 F.3d 103, 104 (D.C. Cir. 2008), thereby avoiding the "need [to] conduct its own" costly clinical trials, Mylan Lab'ys, Inc. v. Thompson, 389 F.3d 1272, 1275 (D.C. Cir. 2004).  Accordingly, to gain approval for an ANDA, an applicant must show that the proposed generic drug is "the same as" the listed reference drug, 21 U.S.C. § 355(j)(2)(A)(ii), (iii), meaning the generic drug must be "identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use," 21 C.F.R. § 314.92(a)(1).  Relevant here, the applicant must also establish that its generic drug is "bioequivalent" to the listed one.  21 U.S.C. § 355(j)(2)(A)(iv).  Drugs are "bioequivalent" if there is no "significant difference in the rate and extent to which the active

ingredient . . . becomes available at the site of drug action when administered at the same . . . dose under similar conditions in an appropriately designed study." 21 C.F.R. § 314.3(b); see also 21 U.S.C. § 355(j)(8)(B)(i) ("A drug shall be considered to be bioequivalent to a listed drug if [] the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses[.]").

To establish bioequivalence, applicants must use "the most accurate, sensitive, and reproducible approach" from a list of methods that the FDA has deemed "acceptable." 21 C.F.R. § 320.24(a), (b). The FDA "may require in vivo or in vitro testing, or both," depending "upon the purpose of the study, the analytical methods available, and the nature of the drug product." Id. § 320.24(a). Listed first among the possible options is "an in vivo test in humans in which the concentration of the active ingredient . . . in whole blood . . . is measured as a function of time." Id. § 320.24(b)(1)(i). For those applicants seeking to prove bioequivalence through this route, FDA regulations offer "guidelines" for how the study "should" be designed. Id. § 320.26(b)(1). At the same time, the regulations permit applicants to use "some other approach" if doing so would be "more appropriate for valid scientific reasons." Id.

Every ANDA must contain detailed information about bioequivalence for the FDA's review, including a report of every bioequivalence study the applicant conducted and "a complete study report . . . for the bioequivalence study upon which the applicant relies for approval." Id. § 314.94(a)(7)(i). Along with the bioequivalence data, each ANDA applicant must provide the FDA with a "description of [its] analytical and statistical methods." Id. § 314.94(a)(7)(iii)(A).

B.  Factual & Procedural Background

Tasimelteon is a sleep-disorder medication first marketed by Vanda under the brand name Hetlioz®.  Compl. ¶ 26.  Vanda submitted an NDA in 2013, providing safety data from 22 clinical studies conducted over three trial phases, spanning 1,346 human subjects from diverse gender and racial backgrounds.  See id. ¶¶ 33–39.  Based on those studies, in January 2014, the FDA approved Hetlioz® to treat Non-24-Hour Sleep-Wake Disorder in male and female patients.[1]  See id. ¶ 40.  Since then, the FDA has approved three generic versions of tasimelteon capsules via the ANDA process.  See FDA, Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations.[2]  This litigation challenges the FDA's approval of the third generic version in early 2023.

In 2018, MSN filed an ANDA for approval to market a generic version of tasimelteon. Compl. ¶ 72.  To demonstrate bioequivalence with Hetlioz®, MSN submitted an "open-label, randomized, balanced, single oral dose, two-treatment, three-period" study conducted in Hyderabad, India, which measured the level of tasimelteon on 44 Asian male subjects.  See id. ¶ 73 (citing Ex. 55 ("MSN BE Review"), at 18, 22–23).  MSN also provided an *in vitro* dissolution study, which reportedly confirmed that its tasimelteon capsules showed drug release comparable to Hetlioz®.  See MSN BE Review at 2, 14, 52.

Based on these studies, the FDA concluded that MSN had established bioequivalence. See id.  Evaluating the all-male *in vivo* study, the FDA found that MSN's tasimelteon capsule "meets the bioequivalence criteria" notwithstanding that the agency's draft "Product Specific

---

[1] Non-24-Hour Sleep-Wake Disorder is a circadian-rhythm sleep disorder that occurs when an individual's body clock does not synchronize with daily cycles of light and dark. Compl. ¶ 27.  Many blind people suffer from the disorder.

[2] Available at https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm.

Guidance" for tasimelteon "recommends" studying the drug "in Healthy males and nonpregnant females (general population)." Id. at 36.  The FDA further found that "objectionable conditions" observed during its visit to the study facility in India did "not impact the reliability of all the data." Id. at 4.  Regarding the *in vitro* study, FDA concluded that the "test product . . . showed comparable drug release" to Hetlioz®.  Id. at 46.

Accordingly, the FDA granted final approval of MSN's ANDA in January 2023.  See Compl, Ex. 54 ("Approval Letter for ANDA No. 211654").  The final approval letter was signed by John Ibrahim, OGD's Director of the Office of Regulatory Operations, on letterhead bearing the name of Edward M. Sherwood, the Associate Director of the Office of Regulatory Operations within OGD.  Id. at 6–7.  As a result of that decision, MSN's generic capsules are now available to the public, marketed by Amneal Pharmaceuticals.  Compl. ¶ 76 (citing Ex. 58).

Five months later, in May 2023, Vanda submitted a "Citizen Petition" challenging the approval.  See Compl. ¶ 92; Citizen Petition from McDermott Will & Emery LLP ("Citizen Petition"), Docket No. FDA-2023-P-1985-0001 (May 16, 2023).  Citizen Petitions are an FDA regulatory device by which any "interested person" may request that the agency "issue, amend, or revoke a regulation or order, or [] take or refrain from taking any other form of administrative action."  21 C.F.R. §§ 10.25(a), 10.30.  The FDA must "furnish a response to each petitioner within 180 days of receipt."  Id. § 10.30(e)(2).  One acceptable response, though, is to inform the petitioner that the FDA requires more time before rendering a final decision.  See id.  Vanda's Citizen Petition requested that the FDA withdraw approval of MSN's ANDA and recall its generic tasimelteon capsules because MSN had "failed to provide sufficient information to establish bioequivalence."  Citizen Petition at 16.  The Petition raised four interrelated critiques of the FDA's bioequivalence determination.

*First*, Vanda's Citizen Petition contended that MSN's bioequivalence studies were fatally flawed because they "did not test the drug in any women nor in a population representative of the racial and ethnic makeup of the United States." Id. at 2. The FDA has spent decades, Vanda claimed, instructing applicants that "clinical studies should, in general, reflect the population that will receive the drug when it is marketed." Compl. ¶ 51 (quoting Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs, 58 Fed. Reg. 39,406, 39,410 (July 22, 1993)). So "if a drug product is intended for use in both sexes," the FDA has long recommended that bioequivalence studies "should include similar proportions of males and females in the study." Citizen Petition at 6 (quoting FDA, Draft Guidance for Industry, Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA 4–5 (Dec. 2013)). The FDA reiterated this instruction as recently as 2022 when advising "applicants to include similar proportions of males and females in" their bioequivalence studies. Id. (quoting FDA, Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted under an ANDA at 1:00:50–1:01:13 (Feb. 24, 2022)).[3] Vanda maintained that those recommendations are well supported by scientific literature, citing legions of studies reportedly showing that biological differences between males and females can affect intake of and reaction to pharmaceuticals. See id. at 6–8 (citing various studies). Tasimelteon is no exception, says Vanda. Multiple studies of tasimelteon allegedly have found differential effects depending on the patient's sex. See Compl. ¶¶ 69–70. Consistent with that view, FDA draft guidance from 2015 recommended including males and nonpregnant females in studies for tasimelteon. See Compl., Ex. 53, FDA, Draft Guidance on Tasimelteon (Sept. 2015), perma.cc/U8KS-HWSM. The same goes for racial and ethnic representation, where the FDA has indicated that

---

[3] Available at www.youtube.com/watch?v=jGffUS-8JVA.

"[e]nrollment in clinical trials should reflect the diversity of the population that is ultimately going to use the treatment."  Citizen Petition at 9 (alteration in original) (quoting FDA, <u>FDA Takes Important Steps to Increase Racial and Ethnic Diversity in Clinical Trials</u> (Apr. 13, 2022), perma.cc/E67P-3JKB).  Once more, this recommendation is purportedly backed by hard data. <u>See</u> <u>id.</u> (citing sources).  In light of this scientific data and the FDA's own recommendations, Vanda faulted the agency for approving MSN's ANDA based on a skewed study that included only 44 Asian males.  <u>See</u> <u>id.</u> at 10–11.  The decision to approve MSN's study is all the more confounding, Vanda continued, because when asked whether "the demographic profile" of MSN's bioequivalence study complied "with current drug product recommendation" to use healthy "males and nonpregnant females (general population)," an FDA reviewer, as shown below, checked "Yes."  <u>See</u> MSN BE Review at 23.

| Is the demographics profile of subjects completing the bioequivalence study in agreement with the current drug product recommendation?  If no, please comment. | ☒ Yes   ☐ No |
| --- | --- |

*Second*, Vanda complained that the FDA did not account for MSN's deviations from separate FDA guidance concerning best practices for clinical studies.  The Citizen Petition highlighted that the FDA generally recommends that clinical trials be "double []blind," meaning "neither the subject nor the investigator knows which treatment is administered to which subject," to reduce any potential bias.  <u>See</u> Citizen Petition at 13 (citing FDA guidance).  The MSN bioequivalence study, however, was conducted "open label"—meaning subjects and researchers were aware of the treatment being given—rather than double blind.  <u>Id.</u>  Again, in Vanda's telling, the FDA failed to explain why this open-label study, which also deviated from standard practice, nonetheless satisfied its study-design standards.  <u>See</u> <u>id.</u>

*Third*, Vanda alleged that during an FDA inspection of the MSN lab, "[s]ignificant objectionable conditions were observed . . . that impacted the reliability of a portion of the audited studies," prompting the inspector to issue a Form FDA 483 indicating that the observed conditions "may constitute violations of the [FDCA]." Id. at 14. Though the FDA concluded that "the inspectional findings were isolated in nature" and "not likely to have an impact on the outcomes of the ANDA," see MSN BE Review at 16–17, Vanda protested that the FDA did not support this conclusion or explain why these conditions, when viewed along with the disfavored study design, did not shake the FDA's confidence in the findings, see Citizen Petition at 14.

*Fourth*, Vanda identified several "unexplained discrepancies" between the results of the MSN bioequivalence study and studies conducted for other tasimelteon products. See id. at 14–16. Vanda argued that MSN's "dissolution profile" indicates that either the reference product was not Hetlioz® or MSN's study suffered from systematic error. Id. It also claimed that the concentration of MSN's generic in the body over time diverged substantially from the concentrations recorded in tests of Hetlioz and another manufacturer's generic. Id. In support of these contentions, four months after it originally filed its Citizen Petition, Vanda submitted a 44-page declaration prepared by Dr. David R. Taft, a professor specializing in pharmacokinetics (i.e., the study of how drugs move through the body). See id., Ex. 66 ("Taft Decl."). Based on his statistical models, "Dr. Taft concluded that MSN's bioequivalence study failed to provide 'credible clinical testing data capable of supporting a reliable determination' that MSN's generic tasimelteon product is bioequivalent to Vanda's Hetlioz® product." Compl. ¶ 88 (citing Taft Decl. ¶¶ 19, 77–80, 112–15).

Four days after submitting the Taft Declaration, and six weeks before the FDA's 180-day deadline to respond to the Citizen Petition, Vanda filed this lawsuit asking the Court to declare

that the approval of MSN's ANDA violated the APA's prohibition on arbitrary, capricious, or otherwise unlawful agency action.  See Compl. ¶¶ 125–35.  This APA challenge closely parrots the arguments voiced in Vanda's Citizen Petition.  Beyond this familiar set of charges, the suit further challenges MSN's ANDA approval under the Appointments Clause of Article II of the Constitution on the ground that the FDA officials who signed off on MSN's application were not officers of the United States and therefore lacked constitutional authority to take such significant action.  See id. ¶¶ 136–46.

Soon after Vanda filed its complaint, the FDA issued an "interim response" to the Citizen Petition in November 2023 explaining that it was "unable to reach a decision on [the] petition because it raises complex issues requiring extensive review and analysis by Agency officials." Mot. Dismiss at 9 (quoting FDA, Tentative Response to Citizen Petition, Dkt. No. FDA-2023-P-1985-0014 (Nov. 8, 2023)).  With no timeline for when it might hear further word on its Petition, Vanda moved for summary judgment on all claims the following month.

The FDA responded with a motion to dismiss the complaint in full under Federal Rule of Civil Procedure 12(b)(6).  At the threshold, the FDA raised three defenses that it said barred judicial review of Vanda's APA challenges: (1) lack of finality; (2) ripeness; and (3) failure to exhaust administrative remedies.  Mot. Dismiss at 12.  It then moved to dismiss Vanda's Appointments Clause challenge because, the same day it filed its motion to dismiss, OGD Director Iilun C. Murphy "affirm[ed] and ratif[ied] the execution of the approval of [MSN's ANDA] . . . based on [her] understanding of the regulatory and scientific standards and [her] general knowledge of the action."  Errata to Mot. Dismiss, Ex. 1 ("Ratification Letter").  In doing so, Dr. Murphy made clear that the "ratification is not intended to be and should not be

considered a response to the Citizen Petition," nor was it "intended to reflect any resolution of the issues raised" in that Petition. Id.

Preferring to take things one step at a time, the Court prioritized the motion to dismiss while deferring summary-judgment briefing. At a hearing on that motion in July 2024, the FDA represented that "it expects to have a decision on Vanda's petition by spring of 2025." Hr'g Tr. at 7:11–12. Though that is right around the corner, the Court will nonetheless forge ahead and resolve the FDA's motion to dismiss.

## II. Legal Standards

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court evaluating a Rule 12(b)(6) motion will "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, a "court need not accept a plaintiff's legal conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are couched as factual allegations." Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40 (D.D.C. 2018) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009)).

## III. Analysis

The FDA raises three distinct threshold challenges to Vanda's APA claims, but they all revolve around the same central idea: Consistent with core principles of judicial economy and justiciability, the agency should apply its expertise in the first instance and resolve the nearly

identical issues raised in Vanda's Citizen Petition before the Court jumps into the fray. As a general matter, the Court agrees. The FDA has been noodling the same set of issues presented in this litigation, and its imminent decision on the Citizen Petition in the coming months could obviate the need for any judicial intervention. For that reason, the Court finds that Vanda's APA claims are presently unripe for judicial review. Moreover, while the parties did not ventilate the matter (and the Court need not definitively resolve it), FDA regulations may *require* Vanda to exhaust its Citizen Petition before proceeding with this legal challenge insofar as it presents "additional information or views" that were not placed before the agency when it approved MSN's ANDA. 21 C.F.R. § 10.45(f). The Court will, accordingly, dismiss Vanda's APA claims without prejudice to renewal should any dispute remain after the FDA resolves the pending Citizen Petition.

The Appointments Clause challenge, by contrast, poses a more difficult question. The Court harbors some doubt about whether the purported ratification of MSN's ANDA cured any infirmity because the statutory authority for Dr. Murphy's appointment as an inferior officer is far from clear cut. Rather than reaching out to decide that issue now—which the Court may not even be able to do in light of the pending Citizen Petition—the Court will stay its hand for the time being and direct the FDA to file a status report in 60 days on two matters that might swing the Court's analysis.

A. APA Claims

The FDA's three threshold defenses—finality, ripeness, and exhaustion—are predicated on the same basic notion that the agency should have the first crack at resolving Vanda's grievances. The Court agrees with that tried-and-true approach and, accordingly, finds that Vanda's APA claims are unripe for judicial review while the FDA is primed to answer the same

questions presented in this litigation in a matter of months.  Additionally, while the parties have

not teed up the issue in their current briefs, Vanda likely may be *required* to exhaust its Citizen

Petition before proceeding with an APA claim that offers "additional information or views" that

were not before the agency when it approved the ANDA.  21 C.F.R. § 10.45(f).  That too weighs

in favor of seeing the Citizen Petition through now that its completion date is on the horizon.

  Before getting to ripeness and exhaustion, however, the Court will address the FDA's

first line of defense against Vanda's APA challenge: the purported lack of final agency action.

  *1. Finality*

  The APA limits judicial review to "final agency action for which there is no other

adequate remedy in a court."  5 U.S.C. § 704.  "While the requirement of finality is not

jurisdictional, without final agency action, there is no doubt that [the plaintiff] would lack a

cause of action under the APA."  Soundboard Ass'n v. Fed. Trade Comm'n, 888 F.3d 1261,

1267 (D.C. Cir. 2018) (citation and quotation marks omitted).  To constitute final agency action,

two conditions must be met: (1) "the action must mark the consummation of the agency's

decisionmaking process," and (2) it "must be one by which rights or obligations have been

determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177–

78 (1997)) (citation and quotation marks omitted).  The FDA contends that, under the D.C.

Circuit's "incurably premature" doctrine, its initial approval of the challenged ANDA is not

"final" because Vanda is seeking what amounts to administrative reconsideration of that decision

through its pending Citizen Petition.  Mot. Dismiss at 21–23.  Though this may not be the

prototypical "incurably premature" case, which gives the Court some pause, the principles

underpinning the doctrine do appear to be triggered here.

Under this Circuit's "incurably premature" doctrine, "a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order." Tenn. Gas Pipeline Co. v. FERC, 9 F.3d 980, 980 (D.C. Cir. 1993) (per curiam) (citing Wade v. FCC, 986 F.2d 1433 (D.C. Cir. 1993) (per curiam)). If a party asks an agency to reconsider its prior decision, the request "renders an agency's otherwise final action non-final with respect to the requesting party," and therefore unreviewable. Clifton Power Corp. v. FERC, 294 F.3d 108, 110 (D.C. Cir. 2002). This bar to APA review applies "regardless of the order of filing" because "[t]he danger of wasted judicial effort that attends the simultaneous exercise of judicial and agency jurisdiction[] arises whether a party seeks agency reconsideration before, simultaneous with, or after filing an appeal or petition for judicial review." Wade, 986 F.2d at 1434 (citation omitted). The FDA argues that this doctrine prevents Vanda from pursuing its dual-track approach of simultaneously challenging the approval of MSN's ANDA before the agency and in court. See Mot. Dismiss at 21–25.

But Vanda has not filed a motion for reconsideration—which it could have done under 21 C.F.R. § 10.33. It instead filed a Citizen Petition, a separate avenue to administrative review with a different set of rules. While a motion for reconsideration must be filed within 30 days of the FDA's initial decision, see id. § 10.33(b), a Citizen Petition can be filed at any time, see id. § 10.25. And whereas a motion for reconsideration is filed under the same docket number as the initial agency decision, see § 10.33(b), a Citizen Petition constitutes a new "administrative proceeding" that is "assigned a unique docket number," id. § 10.25(a)(2), 10.30(c). More importantly, different rules govern what information can be used to challenge agency decisions in motions for reconsideration versus Citizen Petitions: While those filing motions for reconsideration are strictly limited to the "information [and] views" contained in the existing

administrative record, interested parties who file Citizen Petitions can marshal new evidence that was not before the agency during its initial decision.  See id. § 10.33(d)(1), (e).

Vanda contends that these distinct features make all the difference when it comes to the "incurably premature" doctrine.  Because these are "different administrative procedures," it posits, the subsequent filing of a Citizen Petition does not destroy the finality of the earlier approval of MSN's ANDA.  Opp'n (ECF No. 18) at 18.  Moreover, Vanda notes that it was not even involved in the initial administrative proceeding that it now challenges.  Id.  It is rather a "separate party exercising [its] right to seek judicial review of an existing final agency action that affects [it]."  Id.  That, in Vanda's eyes, sets this case apart from almost all others where courts have found the challenge "incurably premature."  Id.

This dispute pits form versus function.  Vanda is correct that, at least in form, its Citizen Petition is not a motion for reconsideration.  And, at times, the D.C. Circuit has hewed to formal differences when finding that the "incurably premature" doctrine does not bar an APA challenge. In Columbia Falls Aluminum Co. v. EPA, for example, the Circuit held that an administrative request for "new rulemaking" did not prevent the plaintiff from mounting an APA challenge to the existing rule because, "[o]nce a rule is final, an agency can amend it only through [such] a new rulemaking" that alters the law on the books.  139 F.3d 914, 919 (D.C. Cir. 1998).  The Circuit extended this line of reasoning in 32 County Sovereignty Committee v. Department of State, 292 F.3d 797 (D.C. Cir. 2002).  There, several groups filed a lawsuit challenging their designations as "foreign terrorist organizations," while, at the same time, they lodged requests with the Department of State to "have their designation revoked."  Id. at 798–99.  Reasoning by analogy, the court held that the plaintiffs' request to revoke their designation did not pose any challenge to judicial review of their initial designation because, as with rulemaking: (1) the

determination of which entities are terrorist organizations was forward-looking; and (2) removal from the terrorist list can only be achieved through a new agency action published in the *Federal Register*. Id. at 799. Vanda places this case on all fours with 32 County Sovereignty Committee because, as there, the Citizen Petition is a request for new administrative action revoking the approval of an ANDA, which would require "publish[ing] a [new] notice in the *Federal Register*." 21 C.F.R § 314.152; see Opp'n at 16–18.

The "incurably premature" doctrine is not rigidly formalist, however. The purpose of the doctrine is to avoid "pointless[ly] wast[ing] . . . judicial energy," TeleSTAR, Inc. v. FCC, 888 F.2d 132, 134 (D.C. Cir. 1989), when "a favorable decision from the agency might yet obviate the need for [judicial] review," Clifton Power, 294 F.3d at 111–12. "Even a modicum of concern for judicial economy militates strongly against concurrent review in this [] situation." Bellsouth Corp. v. FCC, 17 F.3d 1487, 1489 (D.C. Cir. 1994); see also Petroleum Commc'ns, Inc. v. FCC, 22 F.3d 1164, 1171 n.7 (D.C. Cir. 1994) ("It would seem imprudent, to say the least, to pass on the discriminatory application issue . . . when the allegedly discriminatory decision is nonfinal and may be altered by the FCC at Coastel's behest."). To avoid wasting judicial resources and intruding upon agency decisionmaking, then, courts have often looked beyond labels and focused on whether the ongoing agency action raises the same issues that are currently before the court. In Riffin v. Surface Transportation Board, for instance, the Circuit held that the styling of the request as a motion to "reopen[]" rather than a motion for "reconsideration" was "of no moment." 331 F. App'x 751, 752 (D.C. Cir. 2009).

The Circuit spelled out this functional approach in Flat Wireless, LLC v. FEC, where it held that the "incurably premature" doctrine applies beyond core cases where the plaintiff seeks "agency . . . and judicial review of the same underlying order" so long as the parallel challenges

involve the same issues.  944 F.3d 927, 933 (D.C. Cir. 2019).  "To be sure," the court explained,
"our cases applying the 'incurably premature' doctrine often involve a petitioner who has sought
agency reconsideration and judicial review of the same underlying order.  *But not always*."  Id.
(emphasis added) (citations omitted).  What matters is whether the agency is considering "an
identical issue in a separate, still-pending proceeding" that might alter the court's analysis or
entirely vitiate the need for judicial review.  Id.  In Flat Wireless, the plaintiffs had filed a request
to reconsider a portion of an FEC rule that directly overlapped with its challenge to FEC action
applying that rule.  Because the issues were the same, even if the challenged orders were not, the
court held that it lacked the power to hear this grievance.[4]  Id.

        The Circuit reiterated this functional, issue-based approach in Friends of Earth v. U.S.
Nuclear Regulatory Commission, 851 F. App'x 212 (D.C. Cir. 2021).  "Recently," the court
began, "we explained that the incurably premature doctrine applies even if the administrative
appeal involves a 'separate decision[]' from the petition for review before us but the same 'issue'
is being challenged in both."  Id. at 213 (alteration in original) (quoting Flat Wireless, 944 F.3d
at 933).  It therefore made "no difference that Petitioners' administrative appeals challenged
Atomic Safety and Licensing Board orders issued during the license renewal proceedings instead
of the license renewals themselves.  Because the petition for review raises the same legal issues
raised in the administrative appeals and was filed while the administrative appeals were
pending," the court held, "the petition [was] incurably premature."  Id. (citations omitted).  The
controlling factor was simply that "a favorable decision from the agency" on the pending

---

        [4]  The Court notes that Flat Wireless's issue-based approach—which allowed plaintiffs to
challenge some other aspects of the FEC's decision, just not those issues raised in its ongoing
administrative challenge to the 2015 Open Internet Rule—appears to conflict with the well-
established rule that "an agency action cannot be considered nonfinal for one purpose and final
for another."  Bellsouth, 17 F.3d at 1489.

administrative action "might yet obviate the need for review by the court." Id. (quoting Clifton
Power Corp., 294 F.3d at 111–12).

      For its own part, this Court recently took a similar functionalist approach when rejecting
a plaintiff's effort to escape the "incurably premature" doctrine by arguing that her request for a
J-1 work visa was "not a request for reconsideration" of the prior denial of her visa application
but rather "a new application altogether." O'Sullivan v. U.S. Dep't of Health & Hum. Servs.,
No. 22-cv-1189 (CRC), 2024 WL 1071045, at *5 (D.D.C. Mar. 12, 2024). "[A]ccepting that
contention," the Court held, "would elevate semantics over substance." Id. "[R]egardless of
how the resubmission is characterized," what mattered was that the plaintiff was "in fact seeking
reconsideration and modification of the [agency's prior decision], which renders that decision
non-final." Id. (alteration in original) (quoting King v. Leavitt, 475 F. Supp. 2d 67, 72 (D.D.C.
2007)).

      The same could be said here. Regardless of whether Vanda's Citizen Petition is
technically a "motion for reconsideration" or a request for new agency action, the fact remains
that the Citizen Petition pending before the FDA and Vanda's APA challenge in this litigation
present the exact same issue: whether the FDA erred in approving MSN's ANDA. Therefore,
under the functionalist approach articulated in Flat Wireless and Friends of the Earth, there is a
strong argument that the approval of MSN's ANDA is not yet final. That result vindicates the
purposes undergirding the "incurably premature" doctrine because it avoids ensnaring the Court
in a controversy that may well become moot depending on the outcome of the ongoing
administrative proceeding. And, to the extent this result is at odds with the respect for
formalities exhibited in 32 County Sovereignty Committee, that case is distinguishable. In
addition to noting that the revocation of a terrorist designation could only occur via a new entry

in the *Federal Register*, the Circuit also drew the analogy to rulemaking because, like rules, terrorist designations are "forward-looking." 292 F.3d at 799. Here, by contrast, Vanda's Citizen Petition and APA challenges look back at whether the FDA erred in approving MSN's ANDA.

Even so, the Court appreciates the intuitive appeal of Vanda's "common sense" argument that the approval of MSN's ANDA is final regardless of whether Vanda filed a Citizen Petition. Opp'n at 18. MSN's tasimelteon capsules, after all, remain on the shelves of drug stores across the country. Although the Citizen Petition may request that the FDA rescind that approval, for now, legal and real-world consequences are "flow[ing]" from the FDA's decision. See Bennett, 520 U.S. at 178.

Ultimately, though, the Court need not resolve whether the Citizen Petition renders the initial ANDA approval "nonfinal" because these same functional considerations make clear that this case is unripe for judicial review.

### 2. Ripeness

"[R]ipeness is a justiciability doctrine' that is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" Devia v. Nuclear Regul. Comm'n, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807–08 (2003)). In the administrative context, ripeness prevents courts from "premature adjudication" of disputes over which the agency has primary jurisdiction and, thus, avoids "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Id. (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 148–49 (1967)). "In testing whether the facts of a particular case meet th[is] standard of ripeness," courts apply "a two-part analysis, evaluating [1]

the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." Id. (quotation marks omitted).

These two considerations weigh against resolving Vanda's APA claims at this juncture. On the first prong, Vanda's APA challenges are not fit for judicial decision because they raise technical questions that the FDA is currently considering—and which, depending on the FDA's answer, the Court may not need to resolve.  On the second, Vanda has not shown that it will suffer significant hardship from awaiting the FDA's forthcoming decision on its Citizen Petition.

a.   Fitness for Review

"[T]he fitness analysis requires the court to consider both whether the context in which the issue is presented is sufficiently concrete and conducive to judicial determination, and whether deciding the issue now would violate principles of judicial restraint and efficiency[.]" Alcoa Power Generating Inc. v. FERC, 643 F.3d 963, 967 (D.C. Cir. 2011).  "Among other things, the fitness of an issue for judicial decision depends on [1] whether it is purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final." Atl. States Legal Found., Inc. v. EPA, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation and quotation marks omitted).  "These considerations protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." Am. Petroleum Inst. v. EPA, 683 F.3d 382, 387 (D.C. Cir. 2012) (citation and quotation marks omitted).  Applying that test, the Court concludes that Vanda's APA claims are not fit for review because the terrain of this case might soon shift beneath its feet (or crumble altogether) depending on the FDA's resolution of the Citizen Petition.

To start, the issues are not "purely legal."  Atl. States Legal Found., 325 F.3d at 284.

Vanda argues otherwise, on the view that the ultimate question here is simply whether the

approval of the ANDA violated the APA.  See id. ("Claims that an agency's action is arbitrary

and capricious or contrary to law present purely legal issues.").  But this framing misses the full

picture because the APA claim in this case is rife with factual and technical questions about

whether the MSN's bioequivalence study was properly designed, whether the FDA adequately

responded to objectionable conditions in the testing facility, and whether the test results actually

show bioequivalence.  See Compl. ¶¶ 78–89.  On these central questions, Vanda has presented a

litany of scientific studies and hard data.  See Reply (ECF No. 19)  at 3–5 (collecting the

scientific literature and expert reports cited in Vanda's complaint).  Thus, even if the question of

whether the FDA acted in an arbitrary and capricious manner in approving the ANDA is strictly

"legal" in its distilled form, the answer requires working through a web of scientific judgments

that are "particularly within the agency's bailiwick as opposed to . . . the primary competence of

the courts."  Pub. Citizen Health Rsch. Grp. v. FDA, 740 F.2d 21, 31 (D.C. Cir. 1984).

That distinguishes this case from Atlantic States Legal Foundation, which dealt with the

legal issue of whether statutory requirements for waste "storage" applied to waste "collection."

325 F.3d at 283–85.  It also sets this case apart from Cephalon, Inc. v. Sebelius, 796 F. Supp. 2d

212 (D.D.C. 2011), on which Vanda also relies, where the court held that whether the FDCA

permits "a generic . . . [to] contain multiple active ingredients when the [reference listed drug]

contains only one" is the kind of legal dispute fit for judicial review.  Id. at 217.  Interpreting

statutes may be the unique province of the judicial branch, but sifting through reams of scientific

data is decidedly not.  Nor can the Court simply ignore all the studies that line the pages of

Vanda's complaint because some of them have been incorporated into FDA guidance on best

practices for bioequivalence-study designs, as Vanda highlights.  See Opp'n at 20.  "The D.C.

Circuit has sent mixed signals as to whether an agency must account for a departure from its

non-binding guidance."  Indian River Cnty. v. Dep't of Transp., 348 F. Supp. 3d 17, 56 (D.D.C.

2018) (Cooper, J.) (cleaned up).  But to the extent Vanda hangs its hat on *draft* guidance

detailing how tasimelteon studies should best be designed, see Draft Guidance on Tasimelteon,

such draft documents do not form the relevant yardstick for measuring the reasonableness of

agency action.  And when it comes to the more general guidance for bioequivalence studies

overall, the ANDA approval provided some explanation for why the agency blessed MSN's

study design.  See MSN BE Review at 22.  Determining whether that account suffices would

likely force the Court to square the agency's explanation with the science undergirding its advice

for best practices.

      On that note, Vanda casts the dispute as a "legal" review of whether the FDA checked the

wrong box when it reported that MSN's "demographic profile" was "in agreement with the

current drug product recommendation."  See Opp'n at 20–21.  This argument is too clever by

half.  As just mentioned, there was more to the FDA's explanation than mere box checking.

Rather, the FDA offered some account for why MSN's study design on "healthy male subjects"

was "adequate."  MSN BE Review at 22.  The FDA's explanation may not be a model of clarity,

as the Court observed at the hearing.  Hr'g Tr. 36:12–14.  But therein lies the problem:  The

Court is not expert in this field and, accordingly, is not the entity best suited to decide whether

MSN's study was properly designed or whether the results prove bioequivalence.  That would be

the FDA.  Further, as recounted above, there are numerous other challenges nested in the

complaint that involve complicated scientific analysis that would certainly call on the Court to

"think outside the box."

By contrast, the Court agrees with Vanda that this dispute arises in a concrete setting. This factor is primarily designed to weed out challenges to general agency plans before they result in particularized acts.  See, e.g., Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 735–36 (1998) (holding a challenge to overall land management plan was unripe before it has been applied).  Here, however, Vanda is challenging the approval of a specific drug.  The FDA's only retort on this score is that because the Citizen Petition and Vanda's complaint "raise the same objections to the same agency action . . . [,] [b]y dismissing this case and awaiting resolution of the Citizen Petition, the Court would permit FDA to create an administrative record and explain its views."  Mot. Dismiss at 15–16.  Yet that argument sounds more in the register of the final "fit for review" factor: finality.

This last factor returns the Court to the discussion above regarding whether Vanda's pending Citizen Petition renders the approval of MSN's ANDA "nonfinal" under the "incurably premature" doctrine.  The technical answer to this question is beside the point because, for ripeness, whether the agency action is officially "final" is "not dispositive."  Cephalon, 796 F. Supp. 2d at 217.  "Ripeness entails a functional, not a formal, inquiry[,]" and even "a final agency action nonetheless can be unripe for judicial review."  Pfizer Inc. v. Shalala, 182 F.3d 975, 980 (D.C. Cir. 1999).  That is the case here.  For all the functional considerations discussed above, the Court finds that this decision is not ripe for review in this forum while the FDA is currently in the process of reevaluating MSN's ANDA approval and is set to render its decision in several months.  After all, even if the initial approval of that ANDA was "final agency action" under the APA, it was far from the agency's final word on the matter.

That the FDA has more to say and will soon voice its views is, ultimately, the decisive factor on whether this case is ripe for judicial review.  In ticking through these three factors, it is

important not to miss the forest for the trees.  As the D.C. Circuit has stressed, "[T]he 'usually unspoken element of the rationale [behind the ripeness doctrine]' is this:  'If we do not decide [the claim] now, we may never need to.  Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort.  Article III courts should not make decisions unless they have to.'"  <u>Devia</u>, 492 F.3d at 424 (quoting <u>Nat'l Treasury Emps. Union v. United States</u>, 101 F.3d 1423, 1431 (D.C. Cir. 1996)).  "Refusing to involve the courts in ongoing administrative matters [therefore] both protects judicial resources and comports with the judiciary's role as the governmental branch of last resort."  <u>In re Aiken Cnty.</u>, 645 F.3d 428, 434 (D.C. Cir. 2011); <u>see also</u> <u>Devia</u>, 492 F.3d at 426 (explaining prudential ripeness is motivated, in part, by "avoiding the issuance of what could effectively become an advisory opinion").  That principle rings true here:  If the Court does not decide Vanda's challenge now, it may never have to because the FDA is working on the same set of issues presented in the Citizen Petition, and its imminent decision could moot this litigation.  Considerations of judicial efficiency and respect for the administrative process therefore weigh in favor of affording "the agency an opportunity to correct its own mistakes and to apply its expertise."  <u>Ohio Forestry Ass'n</u>, 523 U.S. at 735.

In that respect, this case resembles <u>American Petroleum Institute v. EPA</u>.  There, after petitioners challenged an EPA rule, the agency proposed new rulemaking that would significantly amend the contested regulation.  683 F.3d at 388.  Because the new proposal rendered the prior rule tentative and could potentially "narrow the legal issues involved in th[e] dispute" or require a "substantively different legal analysis and would likely moot the analysis [the court] could undertake if deciding the case now," the D.C. Circuit found the controversy not yet fit for review.  <u>Id.</u> at 388–89.  So too here.

b.  <u>Hardship to Parties</u>

"To outweigh these institutional interests in the deferral of review, any hardship caused by that deferral must be immediate and significant." <u>Id.</u> at 389 (citation and quotation marks omitted).  "The focus of the hardship prong is 'not whether the parties have suffered any direct hardship, but rather whether *postponing* judicial review would impose an undue burden on them or would benefit the court.'" <u>Wellness Pharmacy, Inc. v. Becerra</u>, No. 20-cv-3082, 2021 WL 4284567, at *14 (D.D.C. Sept. 21, 2021) (Cooper, J.) (quoting <u>Vill. of Bensenville v. FAA</u>, 376 F.3d 1114, 1120 (D.C. Cir. 2004)).  Vanda has not shown that it would be significantly harmed by having to wait until spring for a resolution on its Citizen Petition.

At the outset of this dispute, Vanda contended that postponing review here could leave it in the lurch for the foreseeable future.  Although the FDA was required to respond to Vanda's Citizen Petition within 180 days of receipt, <u>see</u> 21 C.F.R. § 10.30(e)(2), the agency satisfied that requirement by issuing an interim response informing Vanda that it needed more time to address the "complex issues" raised in its Petition, <u>see</u> Mot. Dismiss at 9.  Having technically met its regulatory deadline, Vanda complained, all bets were off for when the FDA would render an actual decision on the merits.  Indeed, Vanda warned, studies show that the FDA regularly takes upwards of five to nine years to resolve a Citizen Petition.  <u>See</u> Opp'n at 25 (citing Merrill Thompson, <u>Unpacking Averages: FDA's Extraordinary Delay in Resolving Citizen Petitions</u> (Oct. 3, 2023), perma.cc/ZQJ3-YJB9.12).  Vanda thus decried that it would suffer severe and long-running hardship absent immediate judicial review because it would be forced to compete indefinitely with a generic competitor that, in its telling, should not be on the market.  <u>See</u> Opp'n 24–27.

This effort to show significant hardship always somewhat rang hollow, and it is even more muted now that the FDA has estimated that it plans to complete its review of the Citizen Petition by spring 2025.  <u>See</u> Hr'g Tr. at 7:11–12.

Despite ample opportunity and express invitation from the Court, Vanda has failed to show that the FDA's approval of MSN's generic caused the company significant economic distress.  Vanda alleged in its complaint that "[u]nlawful competition" is causing it to "los[e] critical revenue" due to a dip of "market share" and "severe price erosion."  Compl. ¶¶ 116–17.  But Vanda never offered specifics or marshalled evidence to either support these assertions or tie them to the approval of MSN's generic—even after the FDA raised ripeness in its motion to dismiss and the Court explicitly flagged the issue before the hearing.  <u>See</u> July 1, 2024 Min. Order (directing Vanda to be prepared to identify financial injuries to the company).  The only concrete representation Vanda advanced on this score is that Hetlioz® sales comprise a sizable share of its revenue and that the company's stock price has fallen in recent years.  <u>See</u> Compl ¶ 116–17; Hr'g Tr. at 54:23–55:3.  But this flagging stock value could be caused by myriad factors, including the expiration of Hetlioz®'s exclusivity period and the introduction of multiple competitors in the marketplace other than MSN's generic capsule.

That final point is worth emphasizing.  MSN's is not the first ANDA for tasimelteon that the FDA has approved.  There were already two other generics on the market.  <u>See</u> Mot. Dismiss at 6.  Vanda was therefore facing generic competition prior to the challenged approval, and will continue to do so regardless of the outcome of this litigation.  That sets this case apart from <u>Teva Pharms. USA, Inc. v. Sebelius</u>, where the D.C. Circuit noted that the plaintiff would suffer "severe economic impact" of approving an ANDA over its "claim[] to exclusivity."  595 F.3d 1303, 1311 (D.C. Cir. 2010).  The stakes here appear far lower.  Vanda's exclusivity period

lapsed years ago, and the FDA has already approved multiple tasimelteon products.  The issue

Vanda faces, then, is whether it will have to compete with two generics or three.  Absent

concrete evidence to the contrary, this incremental uptick in competition years after Vanda's

exclusivity period ended would not seem to threaten the sort of severe economic harm that can

override the strong jurisprudential considerations cutting against immediate intervention.  Vanda

might be worse off on the margins if MSN's generic remains on the shelves for the time being,

but the mere "possibility of some financial hardship" is not "such a burden as to warrant a

potentially improvident decision of an otherwise unripe issue by this court."  Am. Petroleum

Inst., 683 F.3d at 390.[5]

Perhaps sensing this weakness in its ability to show significant financial hardship, Vanda

attempts to reach beyond its own reported injuries by pointing to the potential harm to patients

that might ensue if MSN's generic is not actually bioequivalent to Hetlioz®.  Out the gate, it is

not clear what (if any) weight the Court should place on these purported third-party harms.  The

relevant inquiry, which courts have repeated time and again, is "whether delayed review would

cause hardship to the parties."  Ohio Forestry Ass'n, 523 U.S. at 733 (emphasis added).  On its

own terms, then, the ripeness test does not call for a free-form balancing of the public interest.

"[T]he focus of the doctrines of ripeness and finality is predominantly on the interests of the

agency and the regulated entity," the D.C. Circuit has explained.  Pub. Citizen Health Rsch. Grp.

v. FDA, 740 F.2d 21, 31 (D.C. Cir. 1984).  "The[se] doctrines simply do not accommodate the

interests of those whom regulations are meant to benefit or protect."  Id. at 32.  Indeed, the D.C.

Circuit has expressed skepticism as to whether it is even appropriate to consider the effects on a

---

[5]  And even assuming that Vanda will succeed in proving that MSN's generic is not bioequivalent to Hetlioz®, its feared loss of "goodwill" from its customers is far too speculative. Mot. Dismiss at 19.

third-party who has intervened in the case on the government's side because the relevant inquiry is "the degree and nature" of the effects of the agency action "*on those seeking relief*." Devia, 492 F.3d at 427 (emphasis in original) (citations omitted). Because Vanda is not suing in an associational capacity on behalf of any patients, these precedents suggest that such third-party interests should not factor into the ripeness equation.[6]

Even if the Court were to throw these third-party effects onto the scale, they would not tilt the balance in Vanda's favor. The Court does not rule out the possibility that, in some cases, the risks of allowing an unsafe drug to remain on the market could be so great as to warrant immediate judicial intervention. There is no evidence that this is such a case though. MSN's generic has been on the market for over a year, and Vanda does not point to any patient who has been harmed as a result. Nor is it evident that such harm would ensue even if Vanda were correct about the methodological shortcomings in MSN's bioequivalence study. Even assuming the merits of Vanda's claims, then, the feared effects to third parties rest on conjecture. Such speculation is not enough to trump the strong interest in having the FDA address these technical issues first and, potentially, resolving this dispute without need for further judicial intervention.

Finally, whatever purchase Vanda's arguments had has now been lost. The FDA represented at the hearing that "it expects to have a decision on Vanda's petition by spring of 2025." Hr'g Tr. at 7:11–12. So Vanda's nightmare scenario of spending years stuck in administrative limbo does not appear to reflect reality. In all likelihood, Vanda will receive final word on its Citizen Petition in a matter of months. That very well could be before this Court would be able to dig through the extensive administrative record in this case and render a

---

[6]  That is so notwithstanding a stray comment in another D.C. Circuit decision noting that the matter was of "considerable public importance." See Atl. Richfield Co. v. U.S. Dep't of Energy, 769 F.2d 771, 783 (D.C. Cir. 1984).

decision on the parties' pending cross-motions for summary judgment.  It is thus highly doubtful that plowing ahead with this litigation would meaningfully speed up the resolution of this dispute and prevent significant hardship to Vanda or any third party.

In sum, because the APA challenges Vanda raises in its complaint mirror those that it is pressing before the FDA in its ongoing Citizen Petition, the Court may never need to resolve this matter if it allows the FDA to apply its expertise in the first instance.  Meanwhile, Vanda has not offered any concrete evidence that it (or any third parties) will suffer significant hardships while awaiting the outcome of that administrative proceeding.  This case is therefore unripe for judicial review at this juncture.

### 3. Exhaustion

The FDA's first two threshold defenses are predicated on the fact that, in this case, Vanda happened to file a Citizen Petition at the same time it was pursuing this litigation.  Its third and final defense, exhaustion, is different in ilk because it rests not on happenstance but rather on the theory that the FDA regulations *require* Vanda to exhaust its administrative remedies through a Citizen Petition before coming into court.

On this issue, the parties primarily spar over whether any such regulatory exhaustion requirement would be consistent with the APA, see 5 U.S.C. § 704, and whether it should be excused in this case.  But this battle bypasses the first step in the analysis: whether FDA regulations in fact require Vanda to exhaust its Citizen Petition.  The Court has some lingering questions on this antecedent issue that were not addressed in the parties' briefs, so it is not well-positioned to decide this matter now.  Moreover, resolution of this issue is not necessary because the Court has found that the APA claims are not ripe for review given that, in this case, Vanda has filed a Citizen Petition which the FDA will soon resolve.  The Court could stop there and call

it a day.  For the benefit of the parties and others with business before the FDA, however, the
Court will lay out its current thinking on the applicable regulations in the hopes that it might
provide useful guidance going forward.

To be fair, this gap in the current briefing is not the FDA's fault.  In its motion to dismiss,
the FDA maintained that its regulations "require claims like Vanda's to be exhausted so that the
agency will have the opportunity to consider complex scientific issues prior to judicial review."
Mot. Dismiss at 26.  For this point, the FDA cited 21 C.F.R. § 10.45(b), which provides that a
"request that [FDA] take or refrain from taking any form of administrative action must first be
the subject of a final administrative decision based on a petition submitted under § 10.25(a) . . .
before any legal action is filed in [] court complaining of the action or failure to act."  Because
§ 10.25(a) includes the rules for Citizen Petitions that are codified at 21 C.F.R. § 10.30, the FDA
maintained that "Vanda's request that FDA rescind approval of MSN's ANDA must 'first be the
subject of a final administrative decision based on a [citizen] petition.'"  Mot. Dismiss at 26
(quoting 21 C.F.R. § 10.45(b)).

The FDA had solid footing for this position.  Multiple courts had read these regulations
exactly this way—including, most notably, a fellow court in this District in Association of
American Physicians & Surgeons, Inc. v. FDA, 539 F. Supp. 2d 4 (D.D.C. 2008) ("AAPS"),
aff'd, 358 F. App'x 179 (D.C. Cir. 2009).  In AAPS, several organizations challenged the FDA's
approval of a supplemental new drug application ("SNDA") that allowed the emergency
contraceptive drug Plan B to be marketed to consumers over the age of 18 without a prescription.
Id. at 9.  The FDA moved to dismiss the action on the ground that the groups had failed to
exhaust their administrative remedies through a Citizen Petition as required under 21 C.F.R. §
10.45(b).  Id. at 21.  The plaintiffs pushed back, arguing that a neighboring provision, § 10.45(e),

makes clear that exhaustion was not required by providing that "[a]n interested person may request judicial review of a final decision of the Commissioner in the courts *without first petitioning the Commissioner for reconsideration or for a stay of action*."  Id. at 22 (emphasis added.)

The court sided with the FDA.  While recognizing that the "plaintiffs' interpretation of the regulatory requirements ha[d] some surface appeal," the court feared that plaintiffs' reading "would allow 'interested parties to bypass the administrative remedies' and 'would undermine the entire regulatory process'" as well as the core "purpose of the exhaustion doctrine," which is "'the avoidance of premature interruption of the administrative process . . . to let the agency develop the necessary factual background upon which decisions should be based.'"  Id. (quoting in turn Garlic v. FDA, 783 F. Supp. 4, 5 (D.D.C. 1992), and McKart v. United States, 395 U.S. 185, 193–194 (1969)).  Such a strange result was not called for when the regulations were read holistically, the court explained:

> When § 10.45(e) is read together with other applicable provisions, such as § 10.45(b), a different picture is presented that is more in keeping with the rationale underlying the exhaustion doctrine.  [Section] 10.45(b) requires that an interested person's "request that the Commissioner take or refrain from taking any form of administrative action must first be the subject of a final administrative decision based on a petition submitted under § 10.25(a)."  Together with § 10.45(e), these provisions require a party to present its request to the agency and to receive a final decision on that request before seeking judicial review, but do not require the party to pursue an administrative appeal of that final decision before filing its lawsuit.  The party would need a final agency decision on *its* challenge to the approval of a SNDA, but consistent with § 10.45(e) would not then have to seek "reconsideration or . . . a stay" before requesting judicial review.  The agency would thereby have an opportunity to apply its expertise, and courts would have developed administrative records to review.

Id. at 22–23 (citations omitted).  The court thus dismissed the plaintiffs' complaint for failure to exhaust the Citizen Petition process.  Id. at 24.  The D.C. Circuit affirmed the dismissal in an unpublished opinion, noting that the groups "filed no such citizen petition with FDA contesting

the SNDA approval of Plan B and they proffered no legally viable excuse for this failure."  358

F. App'x at 181.  A handful of courts in other jurisdictions have followed suit, dismissing

challenges to drug approvals for failure to exhaust a Citizen Petition.  See Ctr. for Food Safety v.

Hamburg, 142 F. Supp. 3d 898, 902 (N.D. Cal. 2015), rev'd and remanded on other grounds, 696

F. App'x 302 (9th Cir. 2017) ("Not only do the FDA regulations allow an interested person to

file a citizen petition, . . .  [they] 'require that a request' be made to the Commissioner before

filing a complaint in court complaining of an administrative action or failure to act." (quoting

AAPS, 539 F. Supp. 2d at 21)).[7]

    The FDA cited these decisions in its motion to dismiss and noted that, in its previously

filed motion for summary judgment, Vanda did "not dispute either that the text of § 10.45(b)

required it to exhaust administrative remedies, or that it has failed to do so."  Mot. Dismiss at

27.  "Instead, Vanda argue[d] that § 10.45(b) is inconsistent with the limitations on remedy

exhaustion imposed by the APA, 5 U.S.C. § 704, and that even if § 10.45(b) is valid, Vanda

should be excused from complying with it."  Id. (citations omitted).  True to form, Vanda did not

mount a substantive critique of the FDA's reading of its regulations in its opposition.  While its

opposition brief included the header "[e]xhaustion is not required by statute or regulation" under

which it asserted that the "FDA identifie[d] no statutory exhaustion obligation because there is

none," Opp'n at 27–28, that was not accurate.  The FDA had identified a statutory exhaustion

requirement—21 C.F.R. § 10.45(b)—and Vanda again did not contest that § 10.45(b) purported

---

    [7] Others still have cited AAPS with approval when dismissing for failure to exhaust
administrative remedies through a Citizen Petition.  See, e.g., Cody Lab'ys, Inc. v. Sebelius, 446
F. App'x 964, 969–70 (10th Cir. 2011); Holistic Candlers & Consumer Ass'n v. FDA, 770 F.
Supp. 2d 156, 163–64 (D.D.C. 2011).  In these cases, though, the plaintiffs sued before any
party—either themselves or another—had filed a petition with the FDA under 21 C.F.R. § 10.25.
As explored below, that difference sets these cases apart from AAPS, Hamburg, and the present
one in ways that appear relevant for the exhaustion analysis.

to require exhaustion.  It instead pushed the distinct argument that 5 U.S.C. § 704 "precludes this regulation from imposing an exhaustion requirement."  Id. at 28.  Accordingly, in reply, the FDA opened its discussion of exhaustion by noting that "[n]o party disputes that 21 C.F.R. § 10.45(b) requires Vanda to exhaust its APA [c]laims" before turning attention to whether that requirement was permissible under 5 U.S.C. § 704.  Reply (ECF No. 19) at 16.

It was not until the motion hearing, at the Court's prodding, that Vanda followed the plaintiffs in AAPS in arguing that, under 21 C.F.R. § 10.45(e), an interested party can march directly to court without making a pit stop at the agency.  See July 1, 2024 Min. Order (directing the parties to address how "21 C.F.R. § 10.45(b) interact[s] with § 10.45(e) with respect to exhaustion of Citizen Petitions"); Hr'g Tr. at 43:5–45:4 (arguing exhaustion was not required under § 10.45(e)).  At that point, the FDA countered that Vanda had waived the argument.  See Hr'g Tr. at 8:15–22.

For good reason.  "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Hedgeye Risk Mgmt., LLC v. Heldman, 271 F. Supp. 3d 181, 190 (D.D.C. 2017) (citation omitted).  By failing to argue that the FDA's regulations did not require exhaustion until the hearing, the Court would be well within its authority to conclude that Vanda forfeited this fight.  However, given that this is a consequential matter that affects a wide array of players, the Court will do what Vanda chose not to and delve into the relevant regulations nonetheless.

From the Court's foray into the Code of Federal Regulations, it appears that neither the FDA nor the plaintiffs in AAPS have a wholly accurate interpretation of the regulatory scheme. In the FDA's view, 21 C.F.R. § 10.45(b) requires that, in all cases, interested parties who were

not a part of the initial proceeding must file a Citizen Petition before suing in court.  The <u>AAPS</u> plaintiffs, by contrast, argued that § 10.45(e) permits interested parties who have been harmed by an FDA decision to bypass the agency altogether.  Reality may lie somewhere in the middle, as a slow stroll through 21 C.F.R. § 10.45 reveals.

Section 10.45(a) opens by explaining that "[t]his section applies to court review of final administrative action taken by the Commissioner, including action taken under §§ 10.25 through 10.40 and § 16.1(b)."  Section 10.25, in turn, describes the ways of initiating a proceeding before the FDA.  Those include both a "new drug application" such as an ANDA, <u>see</u> § 10.25(a)(1), and "a citizen petition [under] § 10.30," <u>see</u> § 10.25(a)(2).

Section 10.45(b) then provides that a "request that the Commissioner take or refrain from taking any form of administrative action must first be the subject of a final administrative decision based on a petition submitted under § 10.25(a) . . . before any legal action is filed in a court complaining of the action or failure to act."  This provision appears to require that, to file an action in court, there must be a final decision on a petition submitted through § 10.25(a)— which, again, includes both a request for approval of a new drug or a Citizen Petition.

That raises the question:  Why isn't that condition satisfied in this case given the FDA has rendered a decision on MSN's ANDA?  Following the <u>AAPS</u> court's reasoning, the FDA contends that the phrase "final administrative decision" must refer to a final decision on the plaintiff's *own* petition filed under § 10.25(a)—not on a petition filed by another party.  <u>See</u> 539 F. Supp. 2d at 22.  Otherwise, the FDA says, it would not have had the "opportunity to apply its expertise" to the matter.  <u>Id.</u>; see Reply at 9.  Those functional considerations are not voiced in the text of the regulation, however, and a further exploration suggests that this reading might conflict with the overall architecture of § 10.45.

Skipping over one subsection, 21 C.F.R. § 10.45(d) states that "[u]nless otherwise provided, the Commissioner's final decision constitutes final agency action (reviewable in the courts under 5 U.S.C. 701 et seq. . . .), on a petition submitted under § 10.25(a)."  The regulation further provides that it "is the position of the FDA" that: "(i) [f]inal agency action exhausts all administrative remedies and is ripe for preenforcement judicial review as of the date of the final decision, unless applicable law explicitly requires that the petitioner take further action before judicial review is available; [and] (ii) [a]n interested person is affected by, and thus has standing to obtain judicial review of final agency action."[8]  21 C.F.R. § 10.45(d)(1).  An "interested person," meanwhile, is defined capaciously as "a person who submits a petition or comment or objection *or otherwise asks to participate in an informal or formal administrative proceeding or court action*."  21 C.F.R. § 10.3(a) (emphasis added).  Therefore, on their own terms, the FDA regulations specify that a person such as Vanda who "asks to participate . . . in a court action" can sue in court as soon as there is a final administrative decision on any petition filed under § 10.25(a)—even if the "interested person" suing is not the one who filed the initial petition.

Section § 10.45(e) once again may reflect this understanding.  As noted above, § 10.45(e) states that "an interested person may request judicial review of a final decision of the Commissioner in the courts without first petitioning the Commissioner for reconsideration or for a stay of action."  The court in AAPS read this language to apply only to petitions that the interested party filed itself and it merely provides that this entity need not move for reconsideration before suing.  So construed, this is little more than a reiteration of 5 U.S.C.

---

[8]  The Court notes that the regulations use the word "ripe."  However, whether a plaintiff must exhaust a Citizen Petition under the FDA regulations is a separate question from whether Vanda's APA claims are ripe in light of its pending Citizen Petition.  Here, the term "ripe" appears to be referring to that exhaustion issue and not to the legal doctrine of ripeness which, of course, courts must resolve themselves based on Article III and prudential considerations.

§ 704, which already provides that agencies cannot require parties to exhaust motions for reconsideration.  But, from the Court's vantage, this provision does not appear to be limited to the "interested person" who filed the initial petition.  Indeed, given the broad definition of "interested person," that would be a rather odd way of expressing this limitation.  The more natural reading, it would seem, is that an interested person can interject themselves into the dispute by directly suing in court without first asking the agency for a do over.

Again, it appears that the court in <u>AAPS</u> read that restriction into § 10.45(e) to avoid having interested parties cut the agency out of the process and present new issues and arguments to the courts in the first instance.  But that policy concern may be addressed by the provision that immediately follows.  Section § 10.45(f) specifies, in relevant part, that "[a]n interested person who wishes to rely upon information or views not included in the administrative record shall submit them to the Commissioner with a new petition to modify the action under § 10.25(a)."  With this restriction, the regulations potentially alleviate (or, at least, dampen) the <u>AAPS</u> court's concern:  If an interested person seeks to introduce new information and views that were not included in the administrative record, they must first present them to the FDA via a Citizen Petition.  Otherwise, they can go directly to court without seeking reconsideration before the agency.

The provision dealing with motions for reconsideration, 21 C.F.R. § 10.33, jibes with that reading.  Section 10.33(b) provides that an "[a]n interested person may request reconsideration of part or all of a decision of the Commissioner on a petition submitted under § 10.25."  Once more, this provision does not say that person may only seek reconsideration on its own petition.  Instead, as discussed above, it says that any "interested person" can seek reconsideration on any agency decision so long as the petition is not "based on information and views not contained in

the administrative record on which the decision was made." Id. § 10.33(e). "An interested person who wishes to rely on information or views *not* included in the administrative record," by contrast, must "submit them with a new petition to modify the decision under § 10.25(a)"—*i.e.*, a Citizen Petition. Id. (emphasis added).

Viewing these provisions in unison, a clearer vision of the regulatory scheme comes into focus: An interested party can challenge petitions submitted under § 10.25 either by filing a motion for reconsideration or by suing in court—it is the party's choice. If, however, the party wishes to introduce new evidence or views that were not before the agency, it must file a new petition under § 10.25. That system would ensure easy means of redress for all interested parties while also guaranteeing that the FDA has an opportunity to address matters in the first instance.

This is, of course, a different view than the one adopted in AAPS, which was affirmed by the Circuit in an unpublished opinion. Though that decision may not be binding, see D.C. Cir. R. 36(e)(2), the Court is always hesitant to depart from the well-reasoned decisions of colleagues that are held up on appeal. And it is especially wary of doing so where, as here, the parties have not ventilated the issue in their briefs. The Court's reading of the relevant regulations is therefore only provisional. The parties have not teed up this issue for resolution at this juncture, and it would be unfair to excuse Vanda's failure to plumb the regulations and adopt a new interpretation that departs from the existing caselaw in this jurisdiction without providing the FDA a full and fair chance to have its say on the matter.

Furthermore, even under this interpretation of the applicable regulations, it is not clear from the parties' briefs whether Vanda would need to exhaust its Citizen Petition in this case because its challenge to MSN's ANDA approval includes "additional information or views" that were never presented to the FDA. See 21 C.F.R. § 10.45(f). Vanda maintains that it is pursuing

a valid dual-track approach where it is (1) challenging the FDA's approval of the ANDA based on the administrative record in this APA suit; and (2) doing the same before the agency based on *new* evidence presented in its Citizen Petition.  See Hr'g Tr. at 42:17–43:3.  But these two challenges are much more similar than Vanda suggests.  In both, Vanda has tried to build out its case by presenting what appears to be "additional information or views" beyond the administrative record—most notably with its submission of the 44-page Taft Declaration attempting to prove that MSN's studies do not, in fact, show bioequivalence with Hetlioz®.  Dr. Taft's sophisticated scientific analysis of the bioequivalence results was not before the agency when it approved the ANDA, but Vanda clearly relies on this expert analysis both in its complaint and its motion for summary judgment to prove the FDA's decision was arbitrary or capricious.  See, e.g., Compl. ¶¶ 85–88; Vanda MSJ at 17, 24–25.  The same could also be said for the scientific studies that Vanda offers concerning how bioequivalence studies in this context should be designed.  See Reply at 3–5 (cataloging all the scientific literature cited in Vanda's complaint).  Even under the Court's proposed interpretation of the relevant regulations, then, 21 C.F.R. § 10.45(f) may still require that Vanda exhaust its administrative remedies by presenting this new data to the FDA through a Citizen Petition before filing suit.  The parties never duked it out on this issue, though, because this portion of the regulations was not flagged in the briefing.

The Court is thus not well-positioned to resolve the exhaustion issue at this time because the parties did not adequately dig into the FDA regulations in their briefs.  And the Court need not settle this matter because, here, Vanda *did* file a Citizen Petition which the FDA is close to resolving.  This case is therefore unripe for judicial review at this time—which, regardless of whether exhaustion is required, is reason alone to dismiss the APA claims without prejudice until the administrative process runs its course.

*       *       *

The Court recognizes that, in its opposition, Vanda signaled that it may withdraw its pending Citizen Petition if it interfered with the ripeness of this APA challenge.  Opp'n (ECF No. 18) at 36.  Yet that was before the FDA provided an estimate for when it will render a decision on the Petition, and Vanda's top line request was that the Court order the FDA to resolve the Citizen Petition in short order.  Id.  Thus, now that the FDA has indicated that a decision is around the corner, it appears prudent to await that decision before taking further action on this overlapping APA challenge.

B.  Appointments Clause

That leaves Vanda's Appointments Clause challenge contesting the initial authorization, and subsequent ratification, of MSN's ANDA on the ground they were not performed by a duly appointed "Officer[] of the United States."  U.S. Const. art. II, § 2, cl. 2.  As with the APA claims, the Court doubts the propriety of delving into this constitutional challenge now.  For starters, if it is true that Vanda's ongoing Citizen Petition destroys the finality of the initial approval of MSN's ANDA, that would block the Court from reviewing the Appointments Clause challenge—also alleged under the APA—even though Vanda did not include this grievance in its Petition.  See Bellsouth, 17 F.3d at 1489 ("[A]n agency action cannot be considered nonfinal for one purpose and final for another.").  Similarly, while the Appointments Clause challenge might pose a "purely legal" question, the Court still doubts whether it makes sense to jump into this fray now given that the issue may soon become moot depending on the outcome of the Citizen Petition.  See Devia, 492 F.3d at 424.[9]

---

[9]  The parties appear to agree, however, that any exhaustion requirement would not apply to the Appointments Clause issue.  See Hr'g Tr. at 16:11–16, 58:4–11.

At the same time, the Court appreciates the weight of Vanda's Appointments Clause challenge.  The Appointments Clause is designed to ensure "the legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote."  United States v. Arthrex, Inc., 594 U.S. 1, 11 (2021) (citation omitted); see Freytag v. Comm'r, 501 U.S. 868, 884 (1991) (noting the Appointments Clause ensures that power is "wielded" by those who are "accountable to political force and the will of the people").  It achieves these important goals by requiring that any official "exercising significant [federal] authority" must "be appointed in the manner prescribed" by the Constitution—either by being appointed by the President with the Senate's advice and consent or, for inferior officers, by the President or department head pursuant to a statutory authorization.  Buckley v. Valeo, 424 U.S. 1, 126 (1976) (per curiam); see U.S. Const. art. II, § 2, cl. 2.  As Vanda emphasizes, however, neither of the employees who originally approved MSN's ANDA was an "Officer of the United States" appointed through one of these constitutional mechanisms.  See Compl. ¶¶ 100–05.  Nor does Vanda believe that this deficiency was cured by the subsequent ratification of this decision by the OGD Director, Dr. Iilun Murphy, who was ostensibly appointed to her post as an inferior officer by the Secretary of Health and Human Services.  See Opp'n (ECF No. 30) at 32–39.

For the most part, the Court is unconvinced by Vanda's arguments for why Dr. Murphy's ratification of the approval does not solve the problem.  First, Vanda contends that only a principal officer appointed by the President can "issue a final decision binding the Executive Branch."  Opp'n at 32 (quoting Arthrex, 594 U.S. at 23).  The law is clear, though, that inferior officers may issue binding resolutions so long as they are properly supervised by a superior with the power to direct and overrule their decisions.  See Arthrex, 594 U.S. at 13, 23.  That is the case here:  The FDA Commissioner "may at any time reconsider a matter[] on [his] own

initiative," and "reaffirm, modify, or overrule the prior decision, in whole or in part."  21 C.F.R.

§ 10.33(a), (i).  Second, Vanda insists that ratification cannot sufficiently cure any Appointments

Clause violation because, under Lucia v. SEC, 585 U.S. 237, 251–52 (2018), the only adequate

remedy is a complete do over performed by a new, properly appointed decisionmaker.  Opp'n at

43.  But Lucia dealt with the unique issue of administrative law judges with "authority

'comparable to' that of a federal district judge conducting a bench trial."  585 U.S. at 242.  The

ANDA approval process, by contrast, is primarily an *ex parte* procedure where the approving

officer is largely limited to reviewing a cold scientific record submitted by the applicant.  In this

sort of context, "the D.C. Circuit has repeatedly held that an agency's ratification of a prior

decision or action cures any potential Appointments Clause violation if a properly appointed

official has the power to conduct an independent evaluation of the merits and does so."  Moose

Jooce v. FDA, No. 18-cv-1615 (CRC), 2020 WL 680143, at *4 (D.D.C. Feb. 11, 2020) (citation

and quotation marks omitted), aff'd, 981 F.3d 26 (D.C. Cir. 2020) (finding ratification cured

defect two years after Lucia).  Finally, Vanda labels the ratification a "prejudicial sham."  Opp'n

at 43–45.  Again, however, this Circuit's caselaw is clear that, "unless a plaintiff provides

contrary evidence," the ratifier's claimed exercise of "independent judgment . . . should be taken

at face value" even if the Court has "misgivings about whether there was a real fresh

deliberation."  See Moose Jooce, 2020 WL 680143, at *4–5 (quotation marks omitted).  Vanda

has not carried that heavy burden.[10]

---

[10]  Vanda points to the fact that Dr. Murphy ratified the ANDA approval soon after the ratification of her appointment as OGD Director and hours before the FDA filed its motion to dismiss.  See Opp'n at 44–45.  Yet those facts do not indicate that Dr. Murphy had not started her review at that late juncture, as she was already serving as OGD Director for months before then.  Beyond timing, Vanda notes that Dr. Murphy stressed that her ratification did not "reflect any resolution of the issues raised" in the Citizen Petition, see Ratification Letter, and wonders how that could be the case if she really took a fresh look at the issue.  Opp'n at 16.  But Dr.

Before getting to these other critiques, however, Vanda raises a more fundamental and vexing challenge to the ratification by questioning whether Dr. Murphy is, in fact, a properly appointed inferior officer.  "The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress[.]"  United States v. Perkins, 116 U.S. 483, 485 (1886).  Congress therefore must authorize the appointment via some statute.  See United States v. Concord Mgmt. & Consulting LLC, 317 F. Supp. 3d 598, 618 (D.D.C. 2018).  Here, it is unclear whether any congressional statute actually authorized Dr. Murphy's appointment.  Although the Secretary cited "Reorganization Plans" in his appointment letter, those statutes do not include any language authorizing such an appointment.  Accordingly, in its motion to dismiss, the FDA pivoted to 21 U.S.C. § 379d-3a, which provides that the "Secretary may . . . appoint outstanding and qualified candidates to scientific, technical, or professional positions, including cross-cutting operational positions, that support the development, review, and regulation of medical products and the regulation of food and cosmetics."  But it is not obvious whether this statute does the trick either.

 "[N]o magic words are required to grant a department head the power to appoint an inferior officer[.]"  Al Bahlul v. United States, 967 F.3d 858, 874 (D.C. Cir. 2020).  Rather, the question is whether "reading the statute as a whole . . . Congress in fact authorized a department head to appoint an inferior officer."  Id.  Some textual clues suggest that 21 U.S.C. § 379d-3a might authorize the appointment of inferior officers.  Most notably, § 379d-3a uses the word "appoint," which the D.C. Circuit has held could indicate an intent to vest "appointment power."

---

Murphy "had no [] obligation to consider new evidence" post-dating the initial approval, including data and views contained in Vanda's Citizen Petition, so this statement does not prove that the ratification was somehow a sham.  Moose Jooce, 981 F.3d at 29.  And notably, Vanda has not argued that the ratification renders its ongoing Citizen Petition an exercise in futility.  See Hr'g Tr. at 58:4–59:4.

See id. ("While the explicit use of the term 'appoint' may 'suggest[ ]' whether a statute vests the appointment power, our court has held that Congress need not use explicit language to vest an appointment in someone other than the President." (quoting Edmond v. United States, 520 U.S. 651, 658 (1997)).  Section 379d-3a also gives the power to "appoint" to the Secretary, mirroring the requirements described in Article II—a factor that Justice Breyer contended should be given due weight in his separate opinion in Lucia.  See 585 U.S. at 264 (Breyer, J., concurring in part) ("The means of appointment that Congress chooses is also instructive.  Where Congress provides a method of appointment that mimics a method the Appointments Clause allows for 'Officers,' that fact too supports the view that (but does not determinatively decide that) Congress viewed the position as one to be held by an 'Officer,' and vice versa.").  Finally, the statute authorizes the Secretary to pay those appointed under it without regard to any federal pay scale—up to the same salary that the President receives.  See § 379d-3a(b).  In the FDA's telling, it "would strain credulity to conclude that Congress did not contemplate that a person appointed and paid under this statute might exercise significant authority on behalf of the United States."  Reply at 21.

At the same time, other textual and contextual considerations push hard in the opposite direction.  The most potent of which may be the legislative history.  Enacted as part of the 21st Century Cures Act, see Pub. L. No. 114-255, 130 Stat. 1033 (2016), § 379d-3a sought to address the FDA's difficulties recruiting and retaining scientific staff due to large pay disparities relative to private industry by providing "additional hiring and pay flexibilities to HHS to facilitate FDA's recruitment and retention of medical product staff."  Gov't Accountability Off., Agency-Wide Workforce Planning Needed to Ensure Medical Product Staff Meet Current and Future Needs at 3 (Jan. 2022), perma.cc/WG8ZCE9T.   The House Committee Report further reflects that purpose.  At a hearing before the Subcommittee on Health, former CDER Director Janet

Woodcock testified that the FDA had lost many "good scientists" to private companies that pay top dollar and lamented the "extreme difficulty hiring senior people who have worked outside the government."  H.R. Rep. 114-190 (I), 114th Cong., 1st Sess. 2015, 2015 WL 4095625.

Responding to that concern, the House Committee Report explained that § 379d-3a would "enable FDA to hire more efficiently by giving the agency broad and flexible new authority to recruit and retain the staff required to ensure that the agency keeps up with the pace of innovation.  It also includes the ability to offer salaries competitive with those in the private sector and in academia."  Id.  From this legislative history, it appears that § 379d-3a (and its authorization of such steep salaries) may have sought to enable the FDA to attract top-notch employees valued for their technical expertise, and thus may not necessarily have been designed to authorize the appointments of officers with the power to bind the federal government.  This understanding also finds voice in the text of § 379d-3a, which refers to "employees" (rather than "officers") who will "*support* the development, review, and regulation of medical products" (not necessarily make the final calls themselves).  And, at least consistent with that understanding, those appointed under § 379d-3a serve "within the competitive service" rather than the Senior Executive Service.  See 21 U.S.C. § 379d-3(a).  Although none of these considerations may be decisive on their own, they collectively cast doubt on whether § 379d-3a was truly a delegation of appointment power.

Given this doubt, and because the resolution of the Citizen Petition could moot Vanda's Appointments Clause claim, the Court will deny the FDA's motion to dismiss that claim.  It will do so without prejudice to renewal, however, to afford the FDA an opportunity to take a stab at re-ratifying its approval of MSN's ANDA through an official who is on surer footing as an Officer of the United States—if it so chooses.  This route affords the FDA the chance to

potentially remove any constitutional doubts about its approval while ensuring that any vacuum of political accountability is filled as quickly as possible.  At the same time, this deferral will not prejudice Vanda given that the appropriate remedy for an Appointments Clause violation in this particular context would likely be a remand to the agency while staying any vacatur to afford the FDA the opportunity to have a properly appointed officer ratify the decision.  The Court will, accordingly, direct the FDA to submit a status report within 60 days of this Opinion informing the Court of whether it has re-ratified its approval of MSN's ANDA or, alternatively, whether it believes that the FDA's decision on the pending Citizen Petition could itself serve as an effective re-ratification.[11]   In either case, the FDA may renew its defense to Vanda's Appointments Clause claim at the appropriate juncture, most likely through renewed summary-judgment briefing.

## IV.   Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 8] the FDA's Motion to Dismiss Vanda's APA claims is GRANTED; it is further

**ORDERED** that Vanda's APA claims are dismissed without prejudice to renewal in an amended complaint following resolution of its pending Citizen Petition; it is further

 **ORDERED** that [Dkt. No. 8] the FDA's Motion to Dismiss Vanda's Appointments Clause claim is DENIED without prejudice to renewal following resolution of Vanda's Citizen Petition and any decision by the FDA regarding re-ratification; it is further

---

[11]   The FDA has indicated that "ultimate signatory on the decision of the petition would be the director of CDER . . . or her designee."  Hr'g Tr. at 72:6–8.  Yet, from this statement alone, it is unclear whether an officer of the United States would be issuing the final decision on the petition—and, in turn, whether that decision would potentially cure any Appointments Clause defect.

**ORDERED** that [Dkt. No. 24] Vanda's Motion for Summary Judgment and [Dkt. No. 27] the FDA's Cross-Motion for Summary Judgment are DENIED as premature given the uncertainty of the ongoing administrative proceedings; it is further

**ORDERED** that [Dkt. No. 25] Vanda's Motion to Complete and Supplement the Administrative Record is DENIED as moot; and it is further

**ORDERED** that the parties shall not file any further dispositive motions without first meeting and conferring and jointly proposing a briefing schedule (or competing schedules) to the Court; and it is further ordered

**ORDERED** that the FDA is directed to file a status report in 60 days, informing the Court of whether it has opted to re-ratify its approval of ANDA No. 211654 and expressing its views as to whether resolution of the Citizen Petition could itself serve as a re-ratification.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>September 10, 2024</u>